1

2

HONORABLE JUDGE ROBERT J. BRYAN
MAGISTRATE JUDGE J. RICHARD CREATURA

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

9    JOJO EJONGA-DEOGRACIAS,

10                              Plaintiff,

11         v.

12    CHERYL STRANGE, et al.,

13                              Defendants.

NO. 2:21-cv-01004-RJB-JRC

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER

14         The Defendants, CHERYL STRANGE, MICHAEL OBENLAND, and ERIC

15    JACKSON, by and through their attorneys, ROBERT W. FERGUSON, Attorney General,

16    AARON WILLIAMS, and KEITH A. HINES, Assistant Attorneys General, respectfully submit

17    their Response to Plaintiff's Motion for a Temporary Restraining Order (Motion). Dkt. 8.

18                              **I.      INTRODUCTION**

19         As a result of a substantial decrease in the prison population and in response to the

20    legislatures' request to reduce its budget accordingly, the Department of Corrections

21    (Department or DOC) has implemented a thoughtful, staged process to consolidate and close

22    unneeded prison facilities. As part of that effort, the Plaintiff, Mr. Ejonga, has been temporary

23    moved from a single cell in a closed unit to a double cell in a soon-to-be closed unit. He claims

24    this is unconstitutional. But it is well established that double bunking, without a showing of

25    significant resulting harm, does not violate the Constitution. And the claims Ejonga makes about

26    the alleged dangers in the new units are all based on speculation, rather than an actual risk of

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

1

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

irreparable harm. This is particularly true of his claim to be in severe risk of harm due to the COVID -19 pandemic. Because of his young age, the fact that he has already had COVID-19, and because he is fully vaccinated, the risk of serious illness to Ejonga is very low. Therefore, Ejonga has not met the requirements for injunctive relief and this Court should deny his Motion.

## II.        STATEMENT OF FACTS

**A.        Department's Plan to Address Long Term Prison Population Decline**

The Washington State DOC has seen a 54% decrease in prison admissions from March 2020 to June 2021 compared to the same time frames in 2019 and 2020. Declaration of Michael Obenland, ¶ 4. Of the 17,000 total prison beds statewide, approximately 4,000 are empty as of July 20, 2021, and that number is expected to grow. Obenland Dec., ¶ 4. The 2021-23 biennial budget included a reduction in the prison caseload, based on the Caseload Forecast Council's projected average daily prison population (ADP) decrease of 2,500 incarcerated individuals over the biennium. Obenland Dec., ¶ 4. The June 2021 caseload forecast projects an additional ADP decrease of 672 incarcerated individuals in FY 2022, and a 41 ADP decrease in FY 2023. Obenland Dec., ¶ 4.

The decrease is partially due to earlier diversions, interventions, and treatments, as well as a strong focus on expanding community-based reentry programs allowing individuals to safely transition back to their home community. Obenland Dec., ¶ 5. Impactful court decisions such as *State v. Blake* and innovative, less restrictive programs such as graduated reentry (GRE) could further reduce the number of incarcerated individuals in the state's care and custody in the future. Obenland Dec., ¶ 5.

All budgets, including the 2021-2023 biennial budget, passed by the Legislature, and signed by the Governor, require the department to reduce prison spending by $80 million over the next two years. Obenland Dec., ¶ 6. By the State Constitution, the Department must operate within the legislative appropriation. Obenland Dec., ¶ 6. With a significant increase in the number of vacant beds, the state must address this unfunded vacant bed issue now. Obenland Dec., ¶ 6.

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

2

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

Due to a range of complexity among facilities, a phased approach is being used to address the prison population decline:

- First Step – a consolidation of units within facilities,

- Phase 1 - low-impact closures, and

- Phase 2 - high-impact closures.

Obenland Dec., ¶ 7. Each phase addresses a different level and approach to consolidations and closures and will involve meetings with key groups and stakeholders. Obenland Dec., ¶ 8. The Department will reach out to stakeholders to hear comments as we progress through each phase. Obenland Dec., ¶ 8.

Phase 2 conversations with impacted stakeholders started in early August with the Monroe Correctional Complex, which has the largest staff and incarcerated population currently under consideration. Obenland Dec., ¶ 9. As part of the process, the Department has conducted discussions with staff and labor partners, incarcerated individuals, families, advocacy groups, volunteers, and elected leaders connected to all impacted facilities. Obenland Dec., ¶ 9.

The Department is approaching this challenge with a specific objective of limiting impacts, to the extent possible, for incarcerated individuals and their family and support systems. Obenland Dec., ¶ 10. These efforts will include a goal to minimize transfers. Obenland Dec., ¶ 10. The Department will continue with access to programming, academic and vocational education, substance use treatment, sex offender treatment, cognitive behavioral and violence reduction, cultural and religious programming, visitation, and religious practices. Obenland Dec., ¶ 10.

On August 12, 2021, Secretary of the Department, Cheryl Strange, issued a memorandum explaining that all units in the Washington State Reformatory (WSR) are now scheduled for closures part of Phase two. Obenland Dec., ¶ 11. Prior to this closure, incarcerated individuals in C and D units were consolidated into A and B units of the WSR. Obenland Dec., ¶ 11; Exhibit 1, August 12, 2021 Memorandum.

DEFENDANTS' RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER NO. 2:21-CV-01004-RJB-JRC

3

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

WSR C/D unit cells are MI3 (long-term minimum) custody level, and the A/B cells are medium custody level. Obenland Dec., ¶ 12. For security, operational, and classification reasons, the Department can house lower custody individuals in a higher custody classification (in this case, MI3 individuals in medium cells), but the Department's incarcerated individual management system and Department policies prevent it from housing individuals in lower levels of custody than then current classification. Obenland Dec., ¶ 12. The reason for this is that individuals in medium cells require additional staffing and security measures than individuals in minimum custody. Obenland Dec., ¶ 12. As explained by Assistant Secretary Obenland, individuals in minimum security will receive the benefit of additional security during their temporary stay in the medium security A/B WSR units. Obenland Dec., ¶ 12.

The vast majority of cells within DOC are occupied by two incarcerated individuals. Obenland Dec., ¶ 13. Double bunking is ubiquitous throughout state prisons across the United States. Obenland Dec., ¶ 13. According to Assistant Secretary Obenland, it is not atypical at all for prisoners to have cellmates. Having a cellmate is something to be expected when an individual is incarcerated. Obenland Dec., ¶ 13.

Mr. Ejonga is one of the incarcerated individuals who was moved from a single cell in C unit to double bunk cell in B unit. Obenland Dec., ¶ 13. However, his stay at WSR will be temporary. Obenland Dec., ¶ 14. As explained in the August 12 memorandum, all four units at WSR are scheduled to be closed. Obenland Dec., ¶ 14; Declaration of Eric Jackson, ¶ 12. At this time, the Department anticipates that all four units will be completely closed sometime in October. Obenland Dec., ¶ 14. All WSR incarcerated individuals will be moved to other facilities. Jackson Dec., ¶ 12.

The Department has worked hard to limit the impact on incarcerated individuals by maintaining programing opportunities and actively listening to the concerns of the incarcerated population. Obenland Dec., ¶ 15. It is Assistant Secretary Obenland's opinion that it would be irresponsible for the Department to maintain the same number of facilities when the inmate population has decreased significantly. Obenland Dec., ¶ 15.

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

4

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

**B.    DOC's Communicable Disease and Infection Prevention Program and Its Approach to COVID-19**

DOC employs an infectious disease specialist, Dr. Laura Strick, M.D., to advise the Department on polices and procedures to address infectious diseases such as COVID-19. Declaration of Laura Strick, M.D., ¶¶ 1, 2. With her assistance, DOC has developed a Communicable Disease and Infection Prevention Program. Strick Dec., ¶ 3. The Infection Prevention Program focuses on infectious disease prevention, education, identification, and treatment under Dr. Strick's overall oversight. Strick Dec., ¶ 3. Each major prison facility has an Infection Prevention Nurse on-site who helps oversee the implementation of infection prevention protocols locally. Strick Dec., ¶ 3.

DOC's response to the COVID-19 pandemic has been comprehensive and extensive. Strick Dec., ¶ 4. It has touched essentially every aspect of the Department's operations, consumed many tens of thousands of staff work hours, and required expenditures of millions of dollars. Strick Dec., ¶ 4. Over the last year and a half, DOC has put in place numerous measures to mitigate the risk of the pandemic to the incarcerated population and staff, including the mandatory use of surgical masks. Strick Dec., ¶ 4.

Per DOC Health Services' Clinical Guidance, individuals who show symptoms of COVID-19 will be directed to don a surgical mask, if they are not already wearing one, to minimize the potential spread of the virus and are immediately placed in medical isolation. Strick Dec., ¶ 5. Their cellmates and other close contacts will be immediately quarantined until they can be evaluated by a medical provider. Strick Dec., ¶ 5; Exhibit 1, DOC Health Services' Clinical Guidance regarding COVID-19.

Under the DOC Health Services' Clinical Guidance, most patients with laboratory confirmed COVID-19 will remain in medical isolation until they have been symptom-free for 14 days or are clinically improving by day 20. Strick Dec., ¶ 6. Symptomatic patients who test negative for COVID-19 twice and do not have a documented or confirmed alternative diagnosis

DEFENDANTS' RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER NO. 2:21-CV-01004-RJB-JRC

5

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

to explain their symptoms will remain in isolation until they have been symptom-free for 72 hours. Strick Dec., ¶ 6. Individuals who have no symptoms, but have been exposed to those who tested positive for COVID-19 will be quarantined for 14 days. Strick Dec., ¶ 6. If symptoms develop or a test result is positive during quarantine, the patient will be moved to medical isolation. Strick Dec., ¶ 6.

All DOC patients have now been offered vaccination for COVID-19. Strick Dec., ¶ 7. Many DOC patients have chosen to become vaccinated. Strick Dec., ¶ 7. While some vaccinated individuals will still contract the virus as no vaccine is 100% effective, studies have shown that the vaccines available in the United States are extremely effective at preventing serious illness, hospitalizations, and death. Strick Dec., ¶ 7.

**C.     Ejonga Has a Very Low Risk of Serious Illness, hospitalization, or Death from COVID-19**

As explained above, Ejonga, currently resides at the WSR which is part of Monroe Correctional Complex. Declaration of Dr. Areig Awad, M.D., ¶ 3. Dr. Arieg Awad is a medical doctor and the Facility Medical Director at the Monroe Correctional Complex. Awad Dec., ¶ 2. Accordingly to Dr. Awad, Ejonga's medical records reflect he is fully vaccinated against COVID-19 as of May 28, 2021. Awad Dec., ¶ 3. He does not have any medical conditions that make him high risk for COVID-19. Awad Dec., ¶ 3. Furthermore, Ejonga also contracted COVID-19 prior to being vaccinated. Awad Dec., ¶ 3. This fact is conceded by Ejonga in his own Motion. Dkt. 8, at 4.

It is Dr. Awad's opinion that because the currently available COVID-19 vaccines are highly effective at preventing serious illness, his young age (30), his other health conditions, and the fact that he has already had COVID-19 and recovered, Ejonga does not a have serious risk of severe illness, hospitalization, or death even if he were to have a breakthrough infection. Awad Dec., ¶ 4. Dr. Awad's opinion on this issue is consistent with Infectious Disease Specialist Dr. Strick's opinion. Dr. Strick states, "DOC patients that have already recovered from COVID-19

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

6

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

infection may have some level of natural immunity to the disease." Strick Dec., ¶ 8. "However, full vaccination provides additional protection against reinfection." Strick Dec., ¶ 8. "Individuals with an intact immune system (immunocompetent) who have had COVID-19 previously and then get vaccinated have a very low risk of developing serious illness from COVID-19." Strick Dec., ¶ 8.

**D.      The Conditions in Ejonga's New Living Unit Are Humane and They Are Not Overcrowded**

The Monroe Correctional Complex consists of several separate inmate living units including the Special Offender Units, Intensive Management Unit, WSR, and the Twin Rivers Unit which range in custody levels of maximum, close, medium and minimum levels. Jackson Dec., ¶ 3. The Monroe Correctional Complex has capacity to house 2400 male incarcerated individuals. Jackson Dec., ¶ 3.

Ejonga is currently incarcerated at the WSR in a cell with another incarcerated individual. Jackson Dec., ¶ 4. The WSR has the capacity to house 720 male incarcerated individuals. Jackson Dec., ¶ 5. As of August 30, 2021, there are currently 461 incarcerated individuals in the WSR. Jackson Dec., ¶ 5.

WSR has 4 living units entitled A, B, C, and D units. Jackson Dec., ¶ 6. On WSR's A and B units, cells are 6' by 9' for a total of 54 square feet. Jackson Dec., ¶ 7. On WSR's C and D units, cells are 6' by 10' for a total of 60 square feet. Jackson Dec., ¶ 7. WSR's C and D units have closed. Jackson Dec., ¶ 8. Incarcerated individuals who were in C and D units have been consolidated into the A and B units. Jackson Dec., ¶ 8. The occupied cells are designed to house two incarcerated individuals. Jackson Dec., ¶ 8.

WSR's A unit has the capacity to house 316 incarcerated individuals. Jackson Dec., ¶ 9. There are 233 incarcerated individuals housed in WSR's A unit as of August 30, 2021. Jackson Dec., ¶ 9. WSR's B unit has the capacity to house 316 incarcerated individuals. Jackson Dec., ¶

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

7

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

10. There are 238 incarcerated individuals housed in WSR's A unit as of August 30, 2021. Jackson Dec., ¶ 10.

Since the C and D units were consolidated into the A and B units, there have been no fights in A or B unit. Jackson Dec., ¶ 11. One fight occurred in February 2021 in the 3A segregation unit where Community Custody Violators are housed. Jackson Dec., ¶ 11. Further, WSR resolves building maintenance issues as soon as Department officials are made aware of such issues. Jackson Dec., ¶ 13. The noise level in WSR is maintained by unit staff. Jackson Dec., ¶ 14. Finally, since the consolidation, there have been no changes or impacts to WSR's heating and cooling systems and there have been no issues or concerns with the WSR's ventilation system. Jackson Dec., ¶ 15.

### III.    ISSUE PRESENTED

1.    Has Ejonga met the requirements for extraordinary relief in the form of a Temporary Restraining Order or a Preliminary Injunction?

### IV.    STANDARD FOR TEMPORARY RESTRAINING ORDER

A temporary restraining Order or preliminary injunction is an extraordinary remedy, and is never awarded as a matter of right but only "upon a clear showing that the plaintiff is entitled to such relief." *R.F. by Frankel v. Delano Union Sch. Dist.,* 224 F. Supp. 3d 979, 987 (E.D. Cal. Dec. 19, 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20–22 (2008)). The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *NML Cap., Ltd. v. Spaceport Sys. Int'l, L.P.*, 788 F. Supp. 2d 1111, 1117 (C.D. Cal. May 25, 2011); *See also*, *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832 n. 7 (9th Cir. 2001).

"In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter,* 555 U.S. at 24. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* In *Winter*, the

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

8

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1    Court emphasized the need for restraint, holding that "courts of equity should pay particular

2    regard for the public consequences in employing the extraordinary remedy of injunction." *Id.,* at

3    24. When considering the granting of prospective relief against government agencies, the

4    Supreme Court has emphasized that "the [g]overnment has traditionally been granted the widest

5    latitude in the dispatch of its own internal affairs." *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)

6    (citations omitted). This caution applies even more strongly in cases involving the administration

7    of state prisons. *See Turner v. Safley*, 482 U.S. 78, 85 (1987) ("[S]eparation of powers concerns

8    counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have

9    . . . additional reason to accord deference to the appropriate prison authorities.").

10           A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed

11   on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief;

12   (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.

13   *Winter.* 555 U.S. at 20. Under this standard, plaintiffs seeking preliminary relief to demonstrate

14   that irreparable injury is *likely* in the absence of an injunction. *Id.* at 20-22 (citing *Los Angeles*

15   *v. Lyons,* 461 U.S. 95 (1983)). "[A] preliminary injunction will not be issued simply to prevent

16   the possibility of some remote future injury"). *O'Shea v. Littleton,* 414 U.S. 488, 502 (1974). As

17   explained by the Supreme Court, "[i]ssuing a preliminary injunction based only on a possibility

18   of irreparable harm is inconsistent with our characterization of injunctive relief as an

19   extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

20   to such relief." *Winter.* 555 U.S. at 22 (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)

21   (*per curiam*)).

22           In addition, under the Prison Litigation Reform Act (PLRA), preliminary injunctive relief

23   must be narrowly drawn, extend no further than necessary to correct the harm the court finds

24   requires preliminary relief, and be the least intrusive means necessary to correct that harm. 18

25   U.S.C. § 3626(a)(2). Further, the court is required to give substantial weight to any adverse

26

DEFENDANTS' RESPONSE TO                                9                    ATTORNEY GENERAL OF WASHINGTON
MOTION FOR TEMPORARY                                                                    Corrections Division
RESTRAINING ORDER                                                                        PO Box 40116
NO. 2:21-CV-01004-RJB-JRC                                                          Olympia, WA 98504-0116
                                                                                        (360) 586-1445

1   impact on public safety or the operation of a criminal justice system caused by the preliminary

2   relief. 18 U.S.C. § 3626(a)(2).

3   **V.       ARGUMENT**

4   **A.      Ejonga Is Not Likely to Succeed on the Merits**

5          **1.       Double bunking is constitutional.**

6          Ejonga claims that double bunking at WSR creates unconstitutional crowding in

7   violation of the Eighth Amendment. Dkt. 8, at 8. However, in *Rhodes v. Chapman*, 452 U.S.

8   337, 348 (1981), the Supreme Court held that double-celling prison inmates is not a violation of

9   the Eighth Amendment. *Montecastro v. Newsom*, 2020 WL 5017282, at *4 (E.D. Cal. Aug. 25,

10  2020). The inmates in *Rhodes v. Chapman* filed suit seeking an injunction because "double

11  celling confined cellmates too closely" and caused overcrowding of the prison. *Rhodes,* 452

12  U.S.at 340. Based on "extensive findings of fact" in the record, the Supreme Court concluded

13  that double celling of inmates did not lead to conditions that violated the Eighth Amendment,

14  such as the unnecessary infliction of pain; a deprivation of "essential food, medical care, or

15  sanitation;" or the creation of "other conditions intolerable for prison confinement." *Id.* at 348-

16  350.

17         "The Eighth Amendment's prohibition against cruel and unusual punishment protects

18  prisoners not only from inhumane methods of punishment but also from inhumane conditions of

19  confinement." *Morgan v. Morgensen,* 465 F.3d 1041, 1045 (9th Cir. 2006). However, the Eighth

20  Amendment does not "mandate comfortable prisons" that are "free of discomfort*." Rhodes,* 452

21  U.S. at 349. "To the extent that [prison] conditions are restrictive and even harsh, they are part

22  of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347. The

23  Eighth Amendment does proscribe the "unnecessary and wanton infliction of pain," which

24  includes those sanctions that are "so totally without penological justification that it results in the

25  gratuitous infliction of suffering." *Gregg v. Georgia,* 428 U.S. 153, 173, 183 (1976).

26

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

10

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

To prevail on an Eighth Amendment claim for deprivation of humane conditions of confinement, a prisoner must satisfy two requirements: one objective and one subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the objective requirement, the prison official's acts or omissions must be objectively, sufficiently serious and result in the denial of the minimal civilized measure of life's necessities. *Id.* In this regard, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id.* at 832.

Under the subjective component, a prison official must have a "sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834. "[T]hat state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* "Deliberate indifference" exists when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Conversely, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. In addition, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.

Furthermore, allegations of prison overcrowding alone are insufficient to state a claim under the Eighth Amendment. *See, Rhodes,* 452 U.S. at 348*; Balla v. Idaho State Bd. of Corr.,* 869 F.2d 461, 471 (9th Cir. 1989); *Akao v. Shimoda,* 832 F.2d 119, 120 (9th Cir. 1987) (per curiam) (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1249 (9th Cir. 1982)). An overcrowding claim is cognizable only if the plaintiff alleges that crowding has caused an increase in violence, has reduced the provision of other constitutionally required services, or has reached a level rendering the institution no longer fit for human habitation. *Balla,* 869 F.2d at 471.

Here, Ejonga has failed to allege particularized injuries allegedly stemming from overcrowding. Instead, Ejonga has provided nothing but speculative claims about what *might*

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

11

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1    happen in the future, Dkt. 8, at 4-5. As explained above, the Supreme Court has held that a

2    preliminary injunction will not be issued based only on a mere possibility of irreparable harm.

3    *Winter*. 555 U.S. at 22; *O'Shea,* 414 U.S. at 502. Indeed, in the body of his Motion, Ejonga lists

4    no reason other than the contents of a 30 year old order vacating a consent decree as justification

5    for why his are likely to succeed on the merits. Dkt. 8, at 10. In his declaration, Ejonga, only

6    claims, "the facility is mixing two custody levels together creating the *potential* of violence,

7    sickness, and *who knows what*." Dkt. 8-2, at 3.

8          The other declarations submitted by Ejonga with his Motion, , Dkt. 8-2, at 6-9, 14-16,

9    18-20, 22-24, 26-28, offer similar speculation but they are not relevant because Ejonga can only

10   litigate this action on his own behalf; he lacks standing to assert the constitutional rights of

11   others. *See Halet v. Wend Inv. Co*., 672 F.2d 1305, 1308 (9th Cir.1982) (stating that a party must

12   assert his own rights, not those of third parties) (citing *Duke Power Co. v. Carolina Envtl Study*

13   *Group,* 438 U.S. 59, 80 (1978)); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial

14   power exists only to redress or otherwise to protect against injury to the complaining party, even

15   though the court's judgment may benefit others collaterally. A federal court's jurisdiction

16   therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual

17   injury resulting from the putatively illegal action....' ").

18         **2.      Conditions at WSR are humane.**

19         As explained above, the mere *possibility* of a future constitutional harm is insufficient to

20   state an Eighth Amendment claim. *O'Shea,* 414 U.S. at 502. The reality of the situation at WSR

21   is quite different than the alleged potential harms.

22         **a.      WSR is not overcrowded.**

23         As explained by the Superintendent of WSR, the WSR has the capacity to house 720

24   male incarcerated individuals. Jackson Dec., ¶ 5. As of August 30, 2021, there were 461

25   incarcerated individuals in the WSR. Jackson Dec., ¶ 5. WSR's A unit has the capacity to house

26   316 incarcerated individuals. Jackson Dec., ¶ 9. There are 233 incarcerated individuals housed

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

12

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

in WSR's A unit as of August 30, 2021. Jackson Dec., ¶ 9. WSR's B unit has the capacity to house 316 incarcerated individuals. Jackson Dec., ¶ 10. There are 238 incarcerated individuals housed in WSR's A unit as of August 30, 2021. Jackson Dec., ¶ 10. The occupied cells are designed to house two incarcerated individuals. Jackson Dec., ¶ 8. Therefore, the number of inmates housed in both A and B units is far lower than the capacity of those same units and there is no overcrowding.

**b.     There have been no fights as a result of the consolidation.**

As explained by the Superintendent of WSR, '[s]ince the C and D units were consolidated into the A and B units, there have been no fights in A or B unit." Jackson Dec., ¶ 11. "One fight occurred in February 2021 in the 3A segregation unit where Community Custody Violators are housed." Jackson Dec., ¶ 11. Accordingly, Ejonga's fears of increased violence have not materialized.

**c.     The noise level in A and B units is not unconstitutional.**

The Ninth Circuit has held that public conceptions of decency inherent in the Eighth Amendment require that inmates be housed in an environment that, if not quiet, is at least reasonable free of excessive noise. *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996), amended 135 F.3d 1318 (quoting *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1397, 1410 (N.D. Cal. Oct. 18, 1984), aff'd in part, rev'd in part on other grounds, 801 F.2d 1080, 1110 (9th Cir. 1986)). However, for excessive noise to be cognizable under the Eighth Amendment, "it 'must either significantly exceed, or be independent of, the inherent discomforts of confinement.'" *Endsley v. Luna,* 750 F. Supp. 2d 1074, 1100 (C.D. Cal. Aug. 5, 2010) (quoting *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004)).

Here, Ejonga has not presented specific actual allegations to find that the noise level is "excessive." However, as explained by Superintendent Jackson, the noise level in WSR is currently maintained by unit staff. Jackson Dec., ¶ 14. Therefore, Plaintiff has not alleged sufficient facts to establish and Eighth Amendment violation based on noise.

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

13

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1

2

   **d.**  **Housing minimum and medium security inmates together is not a constitutional violation.**

3

4    Again Ejonga has raised nothing more than speculation about potential harms that *might*

happen inmates of different classification levels are housed together. Specifically he states, "the

5 inmates from C and D are minimum custody. Those in A and B are medium custody. Mixing

6 these custody levels together creates a high risk of violence, especially given the mental strain

7 continuously developing over the pandemic." Dkt. 8, at 5. To begin with, allegations that

8 overcrowding made an inmate feel "stress, tension, and unsafe" are insufficient" to state an

9 Eighth Amendment claim. *Rounds v. Woodford*, 2009 WL 1657462, at *2-3 (E.D. Cal. June 12,

10 2009).

11    Further, as explained by Assistant Secretary Obenland, "for security, operational, and

12 classification reasons, the Department can house lower custody individuals in a higher custody

13 classification (in this case, MI3 individuals in medium cells), but our incarcerated individual

14 management system and Department policies prevent it from housing individuals in lower levels

15 of custody than then current classification." Obenland Dec., ¶ 12. "The reason for this is that

16 individuals in medium cells require additional staffing and security measures than individuals in

17 minimum custody." Obenland Dec., ¶ 12. Therefore, Ejonga will actually receive *more* security

18 services in his new cell than he did in his old one. Obenland Dec., ¶ 12. Thus, he cannot show

19 deliberate indifference.

20    **e.**  **The facilities in A and B units are adequate and constitutional.**

21    As explained by Superintendent Jackson, WSR resolves building maintenance issues as

22 soon as Department officials are made aware of such issues. Jackson Dec., ¶ 13. Since the

23 consolidation, there have been no changes or impacts to WSR's heating and cooling systems and

24 there have been no issues or concerns with the WSR's ventilation system. Jackson Dec., ¶ 15.

25 Therefore, the facilities are constitutional and adequate.

26

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

14

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1

2

    **f.**  **The 30 year old consent decree referenced by Ejonga in his Motion has been vacated and is of no import here.**

3

   Plaintiff claims that a now vacated 30 year old consent decree somehow is sufficient to

4

show that he will likely be successful on the merits. Dkt. 8, at 6-7, 10. He cites to a federal

5

government recommendation allegedly about what square footage is adequate for a two person

6

cell. Dkt. 8-2, at 2. But Ejonga has submitted no recommendation at all for Defendants to fairly

7

rebut. And he has failed to show anywhere that a specific square footage has ever been defined

8

by the federal courts as adequate or inadequate. More importantly, the Ninth Circuit upheld the

9

vacation of the consent decree in 1993. *Collins v. Thompson*, 8 F.3d 657, 659 (9th Cir. 1993).

10

The term "vacate" means "to annul; to cancel or rescind; to declare, to make, or to render, void;

11

to defeat; to deprive of force; to make of no authority or validity; to set aside." *MCI*

12

*Telecommunications Corp. v. GTE Nw., Inc.*, 41 F. Supp. 2d 1157, 1163 (D. Or. 1999) (quoting

13

*Action on Smoking & Health v. Civil Aeronautics Board*, 713 F.2d 795, 797 (D.C. Cir. June 30,

14

1983); *See also, Chavez-Dorame v. United States*, 2021 WL 3631274, at *10 (D. Ariz. Aug. 17,

15

2021) (The term "vacate" means "to nullify or cancel; make void; invalidate[.]") (citing *Black's*

16

*Law Dictionary* (10th ed. 2014).

17

   Accordingly, there is no consent decree for the Court to enforce in this matter. Therefore,

18

the vacated consent decree is of no import in this action.

19

    **g.**  **Plaintiff's Due Process claims are all barred by clearly established law.**

20

21

   In his Complaint, Ejonga claims that the Fourteenth Amendment's Due Process Clause

22

is invoked when inmate privileges such as a single cell are removed. Dkt. 7, at 9. This is an

23

incorrect statement of the law. Under the Due Process Clause, protected liberty interests may

24

arise from two sources-the Due Process Clause itself and the laws of the States. *Ky. Dep't of*

25

*Corrections v. Thompson*, 490 U.S. 454, 460, (1989). In *Sandin*, the United States Supreme

26

Court held that liberty interests are not created by negative implications from mandatory

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

15

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

language in prison regulations. *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Rather, to create a liberty interest, the action taken must be an atypical and significant deprivation from the normal incidents of prison life. *Id.*

Here, as explained by Assistant Secretary Obenland, the vast majority of cells within DOC are occupied by two incarcerated individuals. Obenland Dec., ¶ 13. Double bunking is ubiquitous throughout state prisons across the United States. Obenland Dec., ¶ 13. It is not atypical at all for prisoners to have cellmates. Having a cellmate is something to be expected when an individual is incarcerated. Obenland Dec., ¶ 13. Therefore, double bunking is not an atypical and significant deprivation from the normal incidents of prison life and Ejonga has no Due Process rights with regard to being moved from a single cell to a double cell. Furthermore, it is well established that prisoners have no liberty interest in their classification status or in their eligibility for rehabilitative programs. *See Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Myron v. Terhune*, 476 F.3d 716, 718 (9th Cir. 2007); *Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998); *Duffy v. Riveland*, 98 F.3d 447, 457 (9th Cir. 1996); *Hernandez v. Johnston*, 833 F.2d 1316, 1318 (9th Cir. 1987). Therefore, Ejonga's Due Process claims fail as matter of law.

**B.      Ejonga is Not Likely to Suffer Irreparable Harm from COVID-19**

As explained above, Ejonga has not plead sufficient facts to state a claim. For the same reasons, he cannot show that he will suffer irreparable harm. He also cannot show irreparable harm or a constitutional violation based on his own risk of contracting the COVID-19 disease.

As explained by the Department's Infectious Disease Physician, DOC's response to the COVID-19 pandemic has been comprehensive and extensive. Strick Dec., ¶ 4. It has touched essentially every aspect of the Department's operations, consumed many tens of thousands of staff work hours, and required expenditures of millions of dollars. Strick Dec., ¶ 4. Over the last year and a half, DOC has put in place numerous measures to mitigate the risk of the pandemic to the incarcerated population and staff, including the mandatory use of surgical masks. Strick Dec., ¶ 4.

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

16

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

Per DOC Health Services' Clinical Guidance, individuals who show symptoms of COVID-19 will be directed to don a surgical mask, if they are not already wearing one, to minimize the potential spread of the virus and are immediately placed in medical isolation. Strick Dec., ¶ 5. Their cellmates and other close contacts will be immediately quarantined until they can be evaluated by a medical provider. Strick Dec., ¶ 5; Exhibit 1.

Under the DOC Health Services' Clinical Guidance, most patients with laboratory confirmed COVID-19 will remain in medical isolation until they have been symptom-free for 14 days or are clinically improving by day 20. Strick Dec., ¶ 6. Symptomatic patients who test negative for COVID-19 twice and do not have a documented or confirmed alternative diagnosis to explain their symptoms will remain in isolation until they have been symptom-free for 72 hours. Strick Dec., ¶ 6. Individuals who have no symptoms, but have been exposed to those who tested positive for COVID-19 will be quarantined for 14 days. Strick Dec., ¶ 6. If symptoms develop or a test result is positive during quarantine, the patient will be moved to medical isolation. Strick Dec., ¶ 6. Therefore, the Department has procedures in place to protect inmates from the spread of the virus.

Furthermore, all DOC patients have now been offered vaccination for COVID-19. Strick Dec., ¶ 7. Many DOC patients have chosen to become vaccinated. Strick Dec., ¶ 7. While some vaccinated individuals will still contract the virus as no vaccine is 100% effective, studies have shown that the vaccines available in the United States are extremely effective at preventing serious illness, hospitalizations, and death. Strick Dec., ¶ 7.

In Ejonga's specific case, medical records reflect he is fully vaccinated against COVID-19 as of May 28, 2021. Awad Dec., ¶ 3. He does not have any medical conditions that make him high risk for COVID-19. Awad Dec., ¶ 3. And he admits he also contracted COVID-19 prior to being vaccinated. Dkt. 8, at 4; Awad Dec., ¶ 3. Thus, according to the Facility Medical Director at the Monroe Correctional Complex, "because the currently available COVID-19 vaccines are highly effective at preventing serious illness, his young age (30), his other health conditions, and

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

17

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

the fact that he has already had COVID-19 and recovered, Ejonga does not a have serious risk of severe illness, hospitalization, or death even if he were to have a breakthrough infection." Awad Dec., ¶ 4. Therefore, he is also not likely to suffer irreparable harm by being temporarily moved to a double bunked cell.

## C.    The Balance of Equities and Public Interest Do Not Support Ejonga's Claim

As explained by Assistant Secretary Obenland, the Washington DOC has seen a 54% decrease in prison admissions from March 2020 to June 2021 compared to the same time frames in 2019 and 2020. Obenland Dec., ¶ 4. All budgets, including the 2021-2023 biennial budget, passed by the Legislature, and signed by the Governor, require the Department to reduce prison spending by $80 million over the next two years. Obenland Dec., ¶ 6. By the State Constitution, the Department must operate within the legislative appropriation. Obenland Dec., ¶ 6. With a significant increase in the number of vacant beds, the state must address this unfunded vacant bed issue now. Obenland Dec., ¶ 6.

Consequently, if the Court were to grant Ejonga's Motion, it would significantly hamper the Departments ability to enforce the legislature's requirement that it reduce prison spending by $80 million to address the decrease in the number of prisoners. Thus, while Ejonga may have less favorable, but constitutionally adequate, accommodations for a short period, the Department would incur significant costs. The balance of equities weighs heavily in the Defendants' favor. Further, it is not in the public's interest to waste public funds on empty prison beds. The public's interest is in efficient government. Therefore, Ejonga has not met the third and fourth requirements for a temporary restraining order.

## D.    The Relief Requested By Ejonga is Barred by the PLRA

Under the PLRA,:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a *particular plaintiff or plaintiffs*. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation

DEFENDANTS' RESPONSE TO
MOTION FOR TEMPORARY
RESTRAINING ORDER
NO. 2:21-CV-01004-RJB-JRC

18

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1  | of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

2

3

4  18 U.S. Code § 3626(a)(1) (emphasis added). Therefore, the PLRA does not permit the Court to

5  enjoin the Defendants from consolidating the units at WSR. The Court can only grant relief that

6  is narrowly drawn, extends no further than necessary to correct the violation of the Federal right,

7  and is the least intrusive means necessary to correct the violation of the Federal right with regard

8  to a *particular* Plaintiff. Thus, any injunction would not be narrowly drawn if it were to attempt

9  to reverse the consolidation for all effected inmates rather than limiting any injunctive relief to

10 the removal of alleged unconstitutional conditions for Ejonga alone.

## VI.    CONCLUSION

12     For the reasons stated herein, the Defendants respectfully request this Court deny

13 Ejonga's Motion for a Temporary Restraining Order.

14     RESPECTFULLY SUBMITTED this 3rd day of September, 2021.

15                                        ROBERT W. FERGUSON
                                         Attorney General
16
                                         s/ Aaron Williams
17                                       AARON WILLIAMS, WSBA #46044
                                         KEITH HINES, WSBA #47816
18                                       Assistant Attorneys General
                                         Corrections Division
19                                       PO Box 40116
                                         Olympia, WA 98504-0116
20                                       (360) 586-1445
                                         Aaron.Williams@atg.wa.gov
21                                       Keith.Hines@atg.wa.gov

22

23

24

25

26