UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOJO DEOGRACIAS EJONGA,

    Plaintiff,

v.

CHERYL STRANGE, *et al.*,

    Defendants.

CASE NO. 2:21-cv-01004-RJB-JRC

REPORT AND RECOMMENDATION

NOTED FOR: October 8, 2021

    This 42 U.S.C. § 1983 civil rights matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 (b)(1)(A)–(B) and Local Magistrate Judge Rules 1, 3, and 4. Before the Court is plaintiff's motion for a temporary restraining order ("TRO") and preliminary injunctive relief. Dkt. 8.

    Plaintiff, who proceeds *pro se* and who is incarcerated in the Washington State Reformatory facility ("WSR") at the Monroe Correctional Center ("MCC"), brings suit to challenge the consolidation of units at WSR, resulting in plaintiff being double-celled with another prisoner. He has filed the pending motion on the basis that double-celling at WSR during the COVID-19 pandemic violates his Eighth Amendment right to be free from cruel and

unusual punishment, and he requests to have cells returned to "[s]ingle-bunk" status for fourteen days. Dkt. 8, at 1–2.

However, plaintiff has not shown a likelihood of success on the merits because he fails to show that defendants have been deliberately indifferent to the risk of contracting COVID-19 at WSR, notwithstanding the double-celling currently ongoing. Plaintiff has not controverted defendants' evidence that they are following protocols such as masking, quarantining, offering vaccinations, and testing symptomatic and exposed patients and that the double-celling at WSR's remaining units is temporary, lasting only until WSR is closed. Therefore, his motion for a TRO/preliminary injunction should be denied.

## BACKGROUND

### I. Introduction

Plaintiff initiated this suit in July 2021. Dkt. 1. The Court granted plaintiff permission to proceed *in forma pauperis* ("IFP") and served his complaint. Dkts. 6, 7. The Court also directed defendants to respond to the pending motion.

Plaintiff's complaint alleges that defendants (two Department of Corrections ("DOC") officials and the MCC superintendent) are violating his rights to be free from cruel and unusual punishment, to due process, and to equal protection by consolidating units at the WSR. *See* Dkt. 7. He alleges that this has resulted in stripping individuals of their privileges without just cause and that prisoners are overcrowded and suffer (or will suffer) from a lack of adequate ventilation, outbreaks of fights, inhumane noise levels and sleep deprivation, and discomfort using the bathroom in a shared cell. *See* Dkt. 7, at 5–8. Notably for purposes of his motion for a TRO and preliminary injunction, plaintiff alleges that double-celling will place him at an increased risk of contracting COVID-19. Dkt. 7, at 8.

## II. Plaintiff's Evidence

Plaintiff's motion is premised on his argument that conditions at WSR during COVID-19 (particularly double-celling) allegedly violate his right to be free from cruel and unusual punishment. Plaintiff asserts that the consolidation of two living units at WSR into the remaining two units will result in 574 prisoners being held in areas with a total capacity for 360 prisoners. Dkt. 8, at 3. According to plaintiff, under a previous consent decree that has since been vacated, the Court capped the population for two units at 348. *See* Dkt. 8, at 8. Plaintiff also claims that the A and B unit cells where prisoners are being transferred are only 5 by 9 feet. Dkt. 8, at 3; *but see* Dkt. 7, at 5 (alleging that the cells are 54 square feet).

Plaintiff states that on August 4, 2021, he was moved into a double-bunked cell that is 45 square feet, with less than seven inches between the bunk and the toilet. Dkt. 17, at 3. He states that it is difficult for him to use the bathroom, that there have been many prisoner-staff arguments and escalations, and that he is aware of two prisoners who have been removed from the unit for self-reported COVID-19 symptoms. Dkt. 17, at 3–4; *see also* Dkt. 24-1, at 2 (noting that a staff member has tested positive for COVID-19).

In support of his concerns, plaintiff also asserts that in January 2021 (before the consolidation began), a WSR outbreak sickened 80% of prisoners (including plaintiff). Dkt. 8, at 4. He claims that WSR mistreated infected prisoners "by locking them in inhumane and degrading conditions in the Intensive Management Unit." Dkt. 8, at 4. During the August heat waves, he asserts that porters passed out ice, which he feared would potentially spread the COVID-19 virus. Dkt. 17, at 4. Plaintiff also cites low vaccination rates of WSR staff and the spread of the "Delta variant" of COVID-19, sickening even vaccinated people. Dkt. 8, at 4. In addition to his own declaration, plaintiff provides a declaration from another prisoner who is

1 double-celled and states that it is difficult to use the toilet in his cell due to the presence of a
2 cellmate (Dkt. 17, at 8) and that prisoners have suffered restrictions of privileges, moldy
3 showers, and "inhumane sleeping conditions." Dkt. 17, at 9.

### III. Defendants' Arguments

According to defendant Obenland (the DOC assistant secretary for prisons), statewide prison admissions have decreased by more than half from March 2020 to June 2021, compared to the same time period in 2019 and 2020. Dkt. 19, at 2. As of July 20, 2021, approximately 4,000 of 17,000 prison beds statewide were empty, and DOC expected that number to increase. Dkt. 19, at 2. In addition, the 2021 to 2023 State budget requires DOC to reduce prison spending by $80 million over that period. Dkt. 19, at 2. In the face of this decrease in funding and increase in vacant beds, DOC intends to (1) consolidate units within facilities, (2) conduct "low-impact" closures, and then (3) conduct "high-impact" closures. Dkt. 19, at 2. As part of the third step of conducting high-impact closures, DOC intends to close all WSR units—and before doing so, DOC first consolidated prisoners from C and D units into A and B units. Dkt. 19, at 3.

Defendants state that as a consequence of this plan, plaintiff has been moved from the "C" unit (minimum custody level) into a double-bunk cell in the "B" unit (medium custody level) and that "the vast majority of cells within DOC are occupied by two incarcerated individuals." Dkt. 19, at 4. According to defendants, however, the reassignment to "B" is temporary, and DOC "anticipates that all four units [at WSR] will be completely closed sometime in October." Dkt. 19, at 4.

Defendant Jackson, the MCC superintendent, states that the A and B units are 6 by 9 feet and can collectively house 632 prisoners. *See* Dkt. 20, at 2. As of August 30, 2021, A and B units held 471 prisoners. *See* Dkt. 20, at 2. Further, defendant Jackson states that WSR resolves

1 maintenance issues when they learn of such issues, that unit staff maintain the WSR noise level,
2 and that there have been no fights, impacts on heating or cooling, or concerns with ventilation in
3 the A or B units since consolidation. *See* Dkt. 20, at 2–3 (noting that the only fight was in the 3A
4 segregation unit where community custody violators reside).

5       DOC's infectious disease physician also provides a declaration describing DOC's
6 COVID-19 response. Dkt. 21. DOC guidance requires isolating and requiring masking by
7 symptomatic prisoners, quarantining exposed close contacts and cellmates, and quarantining
8 confirmed cases and symptomatic patients. *See* Dkt. 21, at 2. Moreover, she states that DOC has
9 offered all DOC patients COVID-19 vaccination. Dkt. 21, at 2.

## DISCUSSION

**I. Legal Standard**

12       Temporary restraining orders are governed by the same standard applicable to
13 preliminary injunctions. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345,
14 1347 n. 2 (1977). "A plaintiff seeking a preliminary injunction must establish that he is likely to
15 succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary
16 relief, that the balance of equities tips in his favor, and that an injunction is in the public
17 interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

18       With respect to the showing that a plaintiff must make regarding his chances of success
19 on the merits, the Ninth Circuit applies a sliding scale approach. "Under this approach, the
20 elements of the preliminary injunction test are balanced, so that a stronger showing of one
21 element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632
22 F.3d 1127, 1131 (9th Cir. 2011). So long as the other two elements are met, "a preliminary
23 injunction is appropriate when plaintiff demonstrates that serious questions going to the merits

REPORT AND RECOMMENDATION - 5

were raised and the balance of hardships tips sharply in the plaintiff's favor." *Id.* 1134–35 (internal formatting and citation omitted).

The burden to achieve injunctive relief is particularly high when a party seeks a mandatory injunction. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Mandatory injunctions go beyond an injunction preventing a party from acting, and thus beyond mere maintenance of the status quo, requiring a party to act. *Id.* Such a request should be denied unless the facts and law "clearly favor" the moving party. *Id.* (internal quotation marks and citation omitted).

Although the Court generally defers to prison administrators on matters of prison administration (*see Sandin v. Conner*, 515 U.S. 472, 483 (1985)), this deference does not require the Court to give administrators carte blanche to violate prisoners' constitutional rights. *Criswell v. Boudreaux*, No. 120CV01048DADSAB, 2020 WL 5235675, at *20 (E.D. Cal. Sept. 2, 2020).

**II. Preliminary Matters**

The Court next addresses a few preliminary matters. First, at points plaintiff appears to potentially seek relief on behalf of other prisoners at MCC—but he may only litigate claims on behalf of himself. *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1308 (9th Cir. 1982). The Court therefore treats plaintiff's motion as seeking relief solely for himself.

Plaintiff also appears to raise certain claims about the conditions of his confinement other than his claims related to double-celling. He asserts that staff injured his ankle in a door frame (Dkt. 17, at 4), that Washington State prisons have experienced a tuberculosis outbreak since consolidation (Dkt. 24, at 3), that there is no longer programming at WSR other than religious programing (Dkt. 24, at 5), and several other incidents that are peripheral to the claims in his complaint. *See* Dkt. 24-1, at 2–9. The Court cannot grant relief on claims that are unrelated to

the claims contained in plaintiff's complaint. *See Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction.").

### III. Likelihood of Success on the Merits

#### A. Legal Standard

The Eighth Amendment imposes an obligation on defendants to protect the people in their custody because they cannot protect themselves. *See Helling v. McKinney*, 509 U.S. 25, 32 (1993) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment." (Internal formatting and citation omitted.)).

To establish an Eighth Amendment violation, plaintiffs must show an objective and a subjective component: that is, they must show that they were "confined under conditions posing a risk of 'objectively, sufficiently serious' harm and that the officials had a 'sufficiently culpable state of mind[.]'" *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995)). "The subjective component requires the inmates to show that the officials had the culpable mental state, which is deliberate indifference to a substantial risk of serious harm." *Id.* (internal citation and quotation marks omitted). "Deliberate indifference" is established only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "A prison official's

duty under the Eighth Amendment is to ensure reasonable safety," and "prison officials who act reasonably cannot be found liable[.]" *Farmer*, 511 U.S. at 844–45.

### B. Sufficiently Serious Risk of Harm

Prison officials have an Eighth Amendment duty to protect prisoners from exposure to communicable diseases. *See, e.g.*, *Helling*, 509 U.S. at 33 (explaining that prison officials may not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease"). There is no serious question that the risk of contracting COVID-19 poses a substantial risk of serious harm. *See Plata v. Newsom*, 445 F. Supp. 3d 557, 559 (N.D. Cal. Apr. 17, 2020) ("[N]o one questions that [COVID-19] poses a substantial risk of serious harm" to prisoners.); *see also Williams v. Dirkse*, No. 1:21-cv-00047-BAM (PC), 2021 WL 2227636, at *9 (E.D. Cal. June 2, 2021) ("The transmissibility of the COVID-19 virus in conjunction with [the prisoner plaintiff's] living conditions are sufficient to satisfy that 'conditions put the plaintiff at substantial risk of suffering serious harm.'").

Although plaintiff is relatively young, has been vaccinated, and has already caught COVID-19, there can be no serious dispute that the prospect of re-infection poses a significant risk to his health. The Court focuses on whether there is a likelihood that plaintiff could show that defendants have been deliberately indifferent to that risk, which is dispositive of this motion.

### C. Deliberate Indifference

Standing alone, allegations of double-celling and overcrowding do not show a violation of the Eighth Amendment. *Doty v. Cty. of Lassen*, 37 F.3d 540, 545 n.1 (9th Cir. 1994); *Hoptowit v. Ray*, 682 F.2d 1237, 1248–49 (9th Cir. 1982), *abrogated in part on other grounds by Sandin*, 515 U.S. 472; *Rhodes v. Chapman*, 452 U.S. 337, 348–49 (1981). Instead, the overcrowding or double-celling must be shown to have led to specific conditions violating

1. the Eighth Amendment. *See Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 471 (9th Cir. 1981)
2. ("Technically, it may be said that the prison is 50% 'overcrowded,' but this fact has no
3. constitutional significance standing alone. . . . Only when overcrowding is combined with other
4. factors such as violence or inadequate staffing does overcrowding rise to an eighth amendment
5. violation."); *see also Akao v. Shimoda*, 832 F.2d 119, 120 (9th Cir. 1987) (per curiam).
6.     That officials implemented practices that resulted in overcrowding during the COVID-19
7. pandemic does not necessarily amount to an Eighth Amendment violation, either. *See Sanford v.*
8. *Eaton*, No. 120CV00792BAMPC, 2021 WL 3021447, at *7 (E.D. Cal. July 16, 2021)
9. (citing *Booth v. Newsom*, No. 2:20-cv-1562 AC P, 2020 WL 6741730, at *3 (E.D. Cal. Nov. 17,
10. 2020); *Blackwell v. Covello*, No. 2:20-CV-1755 DB P, 2021 WL 915670, at *3 (E.D. Cal. Mar.
11. 10, 2021)). Rather, to prevail on his claims, plaintiff would need to show that defendants did not
12. reasonably respond to the risk of harm. *Accord Sanford*, 2021 WL 3021447, at *8 ("The key
13. inquiry is not whether Defendants perfectly responded, complied with every CDC guideline, or
14. whether their efforts ultimately averted the risk; instead, the key inquiry is whether they
15. 'responded reasonably to the risk.'" (Internal citation omitted.)). Here, plaintiff himself
16. acknowledges that protocols have been established to prevent an outbreak: mask mandates,
17. social distancing requirements, and hand sanitizing stations, for instance. Dkt. 8, at 2; *see also*
18. Dkt. 8, at 5 (stating that social distancing and mask mandates remain in effect); Dkt. 24-1, at 2
19. (describing an incident where a fully vaccinated prisoner did not wear his mask properly).
20. Defendants have come forward with evidence of COVID-19 protocols in DOC facilities, and
21. plaintiff has not provided any evidence to challenge that these protocols are used at MCC WSR:
22.     Over the last year and a half, DOC has put in place numerous measures to mitigate
        the risk of the pandemic to the incarcerated population and staff, including the
23.     mandatory use of surgical masks.
24.

REPORT AND RECOMMENDATION - 9

   . . . Per DOC Health Services' Clinical Guidance, individuals who show symptoms of COVID-19 will be directed to don a surgical mask, if they are not already wearing one, to minimize the potential spread of the virus and are immediately placed in medical isolation. Their cellmates and other close contacts will be immediately quarantined until they can be evaluated by a medical provider. . . .

   . . . Under the DOC Health Services' Clinical Guidance, most patients with laboratory confirmed COVID-19 will remain in medical isolation until they have been symptom-free for 14 days or are clinically improving by day 20. Symptomatic patients who test negative for COVID-19 twice and do not have a documented or confirmed alternative diagnosis to explain their symptoms will remain in isolation until they have been symptom-free for 72 hours. Individuals who have no symptoms, but have been exposed to those who tested positive for COVID-19 will be quarantined for 14 days. If symptoms develop or a test result is positive during quarantine, the patient will be moved to medical isolation.

   . . . All DOC patients have now been offered vaccination for COVID-19.

Dkt. 21, at 2.

  This is not a situation where defendants have failed to reasonably respond to the risk of harm posed by COVID-19 at WSR, even during consolidation of units. Moreover, to the extent that consolidation has exacerbated the risk to plaintiff of contracting COVID-19, plaintiff does not controvert that his housing at WSR is now temporary and that defendants plan to transfer all prisoners at WSR out of that facility as early as October 2021. *See* Dkt. 19, at 4. As defendants argue, prisoners must be transferred because budget cuts necessitate addressing the unfunded vacant bed issue now. Dkt. 19, at 2.

  Other district courts in this circuit have granted preliminary injunctive relief in cases brought by prisoners during the COVID-19 pandemic. But review of these rulings illustrates that those cases are dissimilar from the circumstances argued by plaintiff. In *Chatman v. Ohani*, for instance, the District of Hawai'i granted preliminary injunctive relief where prisoners provided evidence of failure to screen or test new and transferred prisoners for COVID-19; that prisoners with unknown COVID statuses were mixed with others in shared spaces; that social distancing

REPORT AND RECOMMENDATION - 10

1   was not observed and sanitation was so poor that prisoners "are forced to urinate on themselves,
2   on walls, or in cups"; that mask wearing was "inconsistent at best with minimal enforcement, if
3   at all"; that cleaning supplies were not provided or were watered down; and that prisoners with
4   medical conditions were neither isolated nor identified as high risk.  No. CV 21-00268 JAO-
5   KJM, 2021 WL 2941990, at *15–18 (D. Haw. July 13, 2021).  That Court observed that prison
6   administrators had clearly acted with deliberate indifference by—

> knowingly (1) transport[ing] symptomatic inmates from a facility with an active COVID-19 outbreak, (2) who told staff they were ill, (3) who were infected, (4) but whose infections were unconfirmed due to late or no testing, (5) on an airplane, (6) to a facility with no active COVID-19 cases that previously experienced an outbreak, and (7) then hous[ing] those inmates with COVID-negative inmates.

11  *Id.* at 19 (emphasis removed).  And in another example, the Eastern District of California granted
12  preliminary injunctive relief where prison administrators refused to implement an effective
13  testing plan (thereby guaranteeing prisoner exposure to COVID-19), prohibited the use of masks
14  at one point and limited the use of soap, and failed to memorialize any policies in response to the
15  virus.  *See Criswell*, 2020 WL 5235675, at *20.
16          Plaintiff makes much of a consent decree formerly in place and apparently capping the
17  population of MCC WSR at 164 prisoners per each of the four units.  Dkt. 8, at 6.  But he
18  acknowledges that this decree has been vacated—and in any event, as the Court previously
19  noted, overcrowding alone is not enough for plaintiff to establish an Eighth Amendment
20  violation.
21          The Court also briefly observes that plaintiff argues that overcrowding has caused
22  tensions leading to violence at WSR.  But his claim that there have been "many inmates [sic] to[]
23  staff arguments and escalations" (Dkt. 17, at 3) since consolidation fails to allege specific facts
24  

REPORT AND RECOMMENDATION - 11

demonstrating that overcrowding increased violence in a manner that posed a particularized threat of harm to plaintiff. Plaintiff's speculative allegations about increased noise, lack of ventilation, and various other matters also fail to amount to allegations that he has been deprived of the minimal civilized measures of life's necessities to such an extent as to violate the Eighth Amendment. *See Farmer*, 511 U.S. at 834.

Because plaintiff shows neither a likelihood of success on the merits nor that he has raised serious questions going to the merits, his motion must be denied. The Court does not discuss the other factors that plaintiff must establish to obtain preliminary injunctive relief because the failure to show even a serious question going to the merits is dispositive of this matter.

## CONCLUSION

For the reasons set forth above, the Court recommends denying the motion for a TRO and preliminary injunction. Dkt. 8. Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **October 8, 2021,** as noted in the caption.

Dated this 17th day of September, 2021.

J. Richard Creatura
Chief United States Magistrate Judge