1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

JOJO DEOGRACIAS EJONGA,

11                           Plaintiff,

       v.

12

CHERYL STRANGE *et al*,

13                           Defendants.

14

CASE NO. 2:21-cv-01004-RJB-GJL

REPORT AND RECOMMENDATION

Noting Date: September 29, 2023

15        This matter is before the Court on referral from the district court and on Defendants'

16    motion for summary judgment. Dkt. 131.

17        Plaintiff, proceeding *pro se* and currently incarcerated at the Stafford Creek Corrections

18    Center, brings suit against several Department of Corrections ("DOC") and Washington State

19    Reformatory ("WSR") officials related to Plaintiff's previous incarceration at WSR, part of the

20    Monroe Corrections Center ("MCC"). Dkt. 65.

21        Initially, Plaintiff challenged only the officials' August, 2021, consolidation of housing

22    units and their handling of the COVID-19 pandemic at WSR, seeking injunctive relief. Dkt. 7. In

23    his Amended Complaint, Plaintiff sought damages for those claims and brought additional

24

1    Eighth Amendment claims, alleging Plaintiff was subjected to unconstitutional conditions of

2    confinement in MCC's COVID-19 isolation unit when he contracted the disease in January,

3    2020. Dkt. 65. Plaintiff's Amended Complaint also brings claims that certain Defendants

4    retaliated against him after he complained of the COVID-19 isolation conditions, and engaged in

5    other violations of his First Amendment rights. *Id*.

6         For the reasons discussed below, the Court recommends that Defendants' motion for

7    summary judgment be **GRANTED in part and DENIED in part**. The Court recommends that

8    Defendants' motion be **DENIED** as to Plaintiff's retaliation claim against Defendant Watanabe

9    in Count 1, and that the motion be **GRANTED** as to Plaintiff's claims in Counts 2 through 6

10   against the named Defendants and those claims **DISMISSED with prejudice**. The Court further

11   recommends that Plaintiff's claims against "Doe" Defendants, including Count 7, be

12   **DISMISSED without prejudice**.

## I.    BACKGROUND

14   **A.    Procedural History**

15         In August 2021, Plaintiff, proceeding *pro se*, filed a Complaint alleging that Defendants

16   Cheryl Strange (DOC Secretary), Michael Obenland (DOC Assistant Secretary), and Eric

17   Jackson (MCC Superintendent) violated his right (1) to be free from cruel and unusual

18   punishment, (2) to due process, and (3) to equal protection by consolidating housing units at

19   WSR. *See* Dkt. 7. Specifically, Plaintiff alleged that the consolidation, implemented in August

20   2021, resulted in overcrowding, which increased the risk of contracting COVID-19, and stripped

21   him and other prisoners of certain privileges without just cause. *See id.* at 5–8. Along with his

22   Complaint, Plaintiff filed a motion for a temporary restraining order ("TRO") and preliminary

23

24

1  injunctive relief asking the Court to order Defendants to return every cell to "single-bunking."

2  Dkt. 8 at 10.

3  On September 17, 2021, the Court recommended that Plaintiff's motion for a TRO and

4  preliminary injunction be denied because Plaintiff had not shown a likelihood of success on the

5  merits. *See* Dkt. 26 at 12. On November 15, 2021, the Honorable Robert J. Bryan adopted the

6  Court's recommendation, to the extent it recommended dismissal of Plaintiff's motion for TRO

7  and preliminary injunction, because Plaintiff had recently been transferred to another facility,

8  which mooted his requested relief. *See* Dkt. 42 at 2–3.

9  On January 7, 2022, the Court ordered Plaintiff to show cause why his action should not

10  be dismissed as moot after his transfer. *See* Dkt. 49. On March 3, 2022, Plaintiff filed a Response

11  and indicated that he intended to file an amended complaint to include damages and additional

12  Defendants. *See* Dkt. 55 at 4, 7. Plaintiff filed a motion for leave to amend his complaint and a

13  proposed amended complaint on March 15, 2022. *See* Dkts. 56, 57.

14  In his proposed Amended Complaint, Plaintiff cured the deficiency identified by the

15  Court by bringing an Eighth Amendment claim for damages against the original Defendants

16  arising out of the consolidation. *See* Dkt. 57. Plaintiff also included additional claims against

17  newly added Defendants Alex Watanabe (WSR Resolution Coordinator), Carol Smith (WSR

18  Resolution Coordinator), Lee Stemler (WSR Resolution Coordinator), Jack Warner

19  (Superintendent of MCC's Intensive Management Unit ("IMU")), Arben Kullojka (Unit

20  Supervisor of MCC's IMU), and several "Doe" Defendants, for alleged deliberate indifference,

21  retaliation, and discrimination. *See* Dkt. 57. On April 20, 2022, the Court granted Plaintiff's

22  motion to amend. Dkt. 64 at 3. The Court also screened Plaintiff's Amended Complaint and

23  determined that "it includes sufficiently viable claims to merit service on the newly added

24

Defendants" with the exception of the "Doe" Defendants, who were not sufficiently identified to enable them to be served with process. *Id.*[1] Thus, the operative Amended Complaint was filed on April 20, 2022. *See* Dkt. 65.

On May 3, 2022, Defendants brought motions to dismiss and to drop the newly added Defendants as misjoined. Dkts. 67, 69. The Court denied Defendants' motions. Dkts. 101, 109.

The Court issued a Scheduling Order on April 22, 2022, and has since issued several extensions of both the discovery and the dispositive motion deadlines in response to requests from both parties. Dkts. 66, 111, 112, 120. On February 23, 2023, Defendants filed their Motion for Summary Judgment. Dkt. 131. After receiving several extensions of the briefing schedule, Plaintiff filed his Response, with attached exhibits, on June 16, 2023. Dkt. 146. Defendants filed a Reply and additional Declarations, including a Declaration of Defendant Watanabe, on June 23, 2023. Dkts. 147, 148, 149. Plaintiff requested an opportunity to counter the newly-submitted evidence of Defendant Watanabe and, with the Court's leave, filed a Surreply and Declaration on July 21, 2023. Dkts. 152, 153.[2]

**B.      Plaintiff's Allegations and Evidence**

Plaintiff's Amended Complaint and his attached Declaration, as well as his response to Defendants' motion for summary judgment, are signed under penalty of perjury; accordingly, to the extent the allegations are made on personal knowledge and set forth admissible evidence, they are considered as evidence. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004). Plaintiff has also submitted with his summary judgment Response documents relating to his grievances,

---

[1] Despite the Court's warning that Plaintiff must sufficiently identify the Doe Defendants before they could be served, Plaintiff has not done so and has not sought service of these Defendants.

[2] The Court notes that Plaintiff's Declaration appears to be missing a page. *See* Dkt. 153. However, Plaintiff's Surreply, which is also signed under penalty of perjury, appears to fully explain Plaintiff's response to the Watanabe Declaration. Dkt. 152.

1   including numerous "kites" and an infraction proceeding, DOC memoranda announcing the

2   WSR consolidation and closure, and several statements from fellow prisoners.[3] Dkt. 146 at 30–

3   95. The Court summarizes highlights of the parties' allegations and evidence below, and

4   discusses additional relevant evidence in its substantive analysis of Plaintiff's claims.

5        Plaintiff brings seven claims in his Amended Complaint. In Count 1, Plaintiff alleges that

6   Defendant Watanabe violated Plaintiff's First Amendment rights when she retaliated against

7   Plaintiff for threatening litigation over the handling of his grievances about the conditions of his

8   COVID-19 isolation. Dkt. 65 at 13–14, 28–29. Specifically, Plaintiff alleges Defendant

9   Watanabe brought an infraction against Plaintiff after he sent a "kite" to a third party containing

10  a threat of litigation against Defendant Watanabe—and Plaintiff was ultimately found not guilty

11  of the infraction. *Id.* In Count 2, Plaintiff claims Defendant Watanabe interfered with the

12  grievance process by refusing to communicate the outcome of a staff conduct complaint. *See Id.*

13  at 18, 29–30.

14       In Count 3, Plaintiff alleges that Defendants Watanabe, Smith, and Stemler violated his

15  First Amendment rights when they "put a de facto ban on the right to grieve [] conditions of

16  confinement related to [COVID]-19 [i]solation or [q]uarantine." *Id.* at 30. In count 4, Plaintiff

17  alleges that Defendants Warner, Kullojka, and Stemler violated his First Amendment rights when

18  they "[i]nterfered with his right to communicate with his consulate by denying Plaintiff access to

19  consulate call for months . . . ." *Id.* at 31.

20       In count 5, Plaintiff alleges that Defendants Obenland, Warner, Kullojka, Stemler, and

21  certain "Doe" Defendants violated his Eighth Amendment rights in January 2021 when they

22

23  ---

[3] To the extent these statements are signed by their declarants under penalty of perjury, the Court has considered statements within the personal knowledge of the declarants that are material to the issues in this case. However, the statements of Ray Lewis (Dkt. 146 at 80–81) and Anthony Johnson (Dkt. 146 at 82–83) were not signed under penalty of perjury, and will not be considered. *See* Fed. R. Civ. P. 56(c)(4).

24

1    "subjected Plaintiff to cruel and inhumane conditions of confinement during what [was]

2    supposed to be a medical isolation." *Id*. at 31–32. Specifically, Plaintiff alleges prisoners

3    experiencing symptoms of COVID-19 were sent to isolation in MCC's IMU unit, where Plaintiff

4    was placed in a dirty cell and refused cleaning supplies, was limited to two showers per week,

5    was "locked in a cage" without access to fresh air for 21 days and had limited ability to contact

6    his family. *Id*.

7         In count 6, Plaintiff alleges that Defendants Strange, Obenland, Jackson, Warner, and

8    certain "Doe" Defendants "violated Plaintiff's constitutional rights by intentionally subjecting

9    him[] to [a] cruel and inhumane living environment [and] intentionally expo[s]ing him to the risk

10   of a dangerous virus" when they ordered the consolidation of the WSR. *Id*. at 19–28, 32–33.

11        In count 7, Plaintiff alleges a "Doe" Defendant violated Plaintiff's constitutional rights

12   when he made discriminatory remarks to Plaintiff. *See id*. at 17, 33–34.

13        Plaintiff's Amended Complaint seeks monetary damages and declaratory relief. *See id*. at

14   34–37.

15   **C.    Defendants' Evidence**

16        Defendants have submitted Declarations from their counsel (attaching Plaintiff's

17   interrogatory answers), Defendant Watanabe, and Jason Martin (attaching the Offender

18   Grievance Program as of March 2021). Dkts. 132, 149, 148. Defendants also rely on the

19   Declarations of Defendants Obenland and Jackson, and of non-party Lara B. Strick, M.D.

20   (DOC's Statewide Infectious Disease Physician), which were previously submitted with their

21   response to Plaintiff's TRO motion. Dkts. 19, 20, 21.

22        Defendant Jackson states that MCC consists of several separate living units including

23   WSR (at issue here), the Special Offender Unit ("SOU"), Intensive Management Unit ("IMU"),

24

REPORT AND RECOMMENDATION - 6

Twin Rivers Unit ("TRU") and a Minimum Security Unit ("MSU"). Dkt. 20 at ¶ 3. MCC has capacity to house a total of 2400 male inmates. *Id.* WSR, which was comprised of four units, had a total capacity of 720. *Id.* at 222, ¶ 5. The consolidation at issue in this case initially closed WSR's C and D units, where prisoners had been housed in individual cells; those inmates were transferred to the A and B units—where each cell housed two prisoners. *Id.* at ¶ 8.

WSR's A and B units each have the capacity to house 316 individuals. 20 at ¶¶ 9, 10. As of August 30, 2021, there were 230 inmates remaining in A unit and 238 in B unit. *Id.* Defendant Jackson states that there have been no fights in A or B units since consolidation, that WSR resolved maintenance issues when they learned of such issues, that unit staff maintained the WSR noise level, and that there were no impacts on heating or cooling, nor concerns with ventilation in the A or B units after consolidation.  *Id.* at ¶¶ 11–15.

Defendant Obenland states that the DOC "has seen a 54% decrease in prison admissions from March 2020 to June 2021 compared to the same time frames in 2019 and 2020." Dkt. 19 at ¶ 4. As of July 20, 2021, approximately 4,000 of 17,000 prison beds in Washington State were empty, and DOC expected that number to increase. *Id.* In addition, the 2021 to 2023 State budget required DOC to reduce prison spending by $80 million over that period. *Id.* at ¶ 6. In the face of this decrease in funding and increase in vacant beds, DOC implemented a plan to consolidate units within facilities, then to conduct "low-impact" closures, followed by "high-impact" closures. *Id.* at ¶ 7.

Defendant. Obenland states that individuals in C and D (long-term minimum custody level) units of the WSR were consolidated into A and B (medium custody level) units of the WSR in anticipation of the closure of all WSR units. Dkt. 19 at ¶ 11. He states that the reason those housed in C and D units were moved to A and B units was because medium custody level

1    prisoners cannot be housed in minimum custody units. *Id*. at ¶ 12. Defendant Obenland states

2    that Plaintiff was moved from a single-cell in C unit to a double-cell in B unit. *Id*. at ¶ 13.[4] He

3    states that the "vast majority of cells within DOC are occupied by two incarcerated individuals."

4    *Id.* Defendant Obenland states that Plaintiff's stay at WSR's B-unit was designed to be

5    temporary, as DOC anticipated the closure of all four units in October, 2021. *Id.* at ¶ 14. Indeed,

6    the record shows that Plaintiff was transferred from WSR on November 1, 2021, and was

7    ultimately placed at his current confinement at SCCC on November 15, 2021. Dkt. 46

8    (Declaration of Salina Brown) at ¶¶ 3, 5.

9         Defendants also rely on the Declaration of DOC infectious disease physician Lara B.

10    Strick, M.D. Dr. Strick states that DOC's response to the COVID-19 pandemic "has been

11    comprehensive and extensive," requiring tens of thousands of staff work hours and expenditures

12    of millions of dollars. Dkt. 21 at ¶ 4. She states that DOC has created a COVID-19 Guidance

13    document, which has been regularly updated and improved over time. *Id.* Dr. Strick states that

14    the Guidance requires isolating and masking by symptomatic prisoners, quarantining exposed

15    close contacts and cellmates, isolating confirmed cases and symptomatic patients, and testing. *Id*.

16    at ¶ 5; *see also* Ex. 1 to Strick Declaration, Dkt. 28 at 175–219 (Version 27 of the protocol, dated

17    July 13, 2021). The Guidance provides that patients with laboratory-confirmed COVID-19 are

18    required to remain in medical isolation until they have been symptom-free for 14 days or are

19    clinically improving by day 20. *Id.* at ¶ 6. Finally, Dr. Strick states that DOC has offered all

20    DOC patients COVID-19 vaccinations. *Id.* at ¶ 7.

21         Defendants also submitted the Declaration of Dr. Areig Awad, MCC's Facility Medical

22    Director, who states that Plaintiff has been fully vaccinated against COVID-19 and has no

23

24    _____

[4] The record demonstrates that this move occurred on August 4, 2021. Dkt. 17 at 4.

1    known medical conditions placing him at high risk for COVID-19 complications. Dkt. 22 at ¶ 3.

2    In light of Plaintiff's vaccination status, his prior COVID-19 infection and recovery and his

3    young age and health status, it is Dr. Awad's opinion Plaintiff does not have a serious risk of

4    severe illness, hospitalization or death even if he were to experience a breakthrough infection. *Id*.

5    at 4.

## II.    LEGAL STANDARD

**A.    Standard of Review**

8          Summary judgment is appropriate when the "movant shows that there is no genuine

9    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

10    Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The central issue is

11    "whether the evidence presents a sufficient disagreement to require submission to a jury or

12    whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at

13    251–52.

14          The moving party bears the initial burden of showing "that there is an absence of

15    evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

16    (1986). Where the moving party does not bear the burden at trial, it can carry its initial burden by

17    presenting evidence that negates an essential element of the nonmoving party's case, or by

18    establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden at

19    trial. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir.

20    2000).

21          If the moving party meets its initial responsibility, the burden then shifts to the

22    nonmoving party to establish a genuine issue of material fact for trial. *Matsushita Elec. Indus.*

23    *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). Genuine disputes are those for which

24    the evidence is such that a "reasonable jury could return a verdict for the nonmoving party."

1    *Anderson*, 477 U.S. at 257. Material facts are those which might affect the outcome of the suit

2    under governing law. *Id.* A mere scintilla of evidence is insufficient to create a factual dispute.

3    *Id.* at 252. Likewise, the nonmoving party cannot "defeat summary judgment with allegations in

4    the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v.*

5    *Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

6          Allegations based merely on the Plaintiff's belief are insufficient to oppose summary

7    judgment, as are unsupported conjecture and conclusory statements. *Id.*; *McElyea v. Babbitt*, 833

8    F.2d 196, 197–98 n.1 (9th Cir. 1987). In ruling on a motion for summary judgment, the Court

9    must draw all reasonable inferences in favor of the nonmoving party, *Matsushita Elec. Indus.*

10   *Co.*, 475 U.S. at 587, and may not weigh the evidence or make credibility determinations,

11   *Anderson*, 477 U.S. at 248.

12   **B.    Section 1983 Standard**

13         In order to recover pursuant to 42 U.S.C. § 1983, a plaintiff must prove that: (l) the

14   conduct complained of was committed by a person acting under color of state law and (2) the

15   conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws

16   of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds,*

17   *Daniels v. Williams*, 474 U.S. 327 (1986). The causation requirement of § 1983 is satisfied only

18   if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's

19   affirmative act, or omitted to perform an act which he or she was legally required to do that

20   caused the deprivation complained of. *Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350, 1355

21   (9th Cir. 1981).

22

23

24

1

## III.   DISCUSSION

2

**A.    Retaliation (Count 1)**

3

Plaintiff contends Defendant Watanabe, a Resolution Specialist at MCC, retaliated

4

against him by filing an infraction notice after he sent a kiosk message to his counselor

5

threatening litigation against Defendant Watanabe. Dkt. 65 at 29. Defendant Watanabe argues

6

she did not file the infraction for a retaliatory purpose, and contends Plaintiff suffered no harm

7

because he was found not guilty. Dkt. 131 at 10. Defendant Watanabe further argues that she is

8

entitled to qualified immunity. Dkt. 147 at 3–10.

9

1.   Facts

10

Plaintiff filed multiple grievances regarding the conditions of his isolation for COVID-

11

19, which were deemed to be non-grievable "due to pandemic conditions." *See, e.g.* Dkt. 65 at

12

66, 68, 70. On February 24, 2021, Plaintiff filed a separate grievance against that finding. Dkt.

13

65 at 71. Defendant Watanabe denied the latter grievance on the ground that Plaintiff was "over

14

limit"—that is, he had exceeded the allowable number of pending grievances. *Id*. On March 17,

15

2021, Plaintiff sent the following message criticizing the grievance response to his counselor,

16

Victoria Hathaway (a non-party to this action) via WSR's Kiosk system:

17
18

> It is crazy while yall [sic] got me sick, torture me in IMU, I grieve yall [sic], then
> yall [sic] want to write me up. This is intimidation and Harassment. Let Watanabe
> know, I will see her in Court.

19

Dkt. 65 at 13.

20

Ms. Hathaway forwarded the message (in part[5]) to Defendant Watanabe, who on the

21

same day filed an infraction notice against Plaintiff, stating that she considered Plaintiff's

22

23
24

[5] The message Defendant Watanabe received from Ms. Hathaway omitted the sentence "This is intimidation and Harassment." Dkt. 65 at 46; Dkt. 149 at ¶¶ 5, 6. Defendant Watanabe attached to the infraction notice the version of the message she had received from Ms. Hathaway. Dkt. 149 at ¶¶5, 6.

litigation threat to be an attempt to intimidate her from enforcing the grievance program rules.[6]

Dkt. 65 at 46, 48. Plaintiff was accused of violating "WAC 663," prohibiting intimidation and

coercion; Defendant Watanabe recommended a sanction of 30 days' communication restriction.

*Id*. After a hearing, Plaintiff was found not guilty. The Hearing Officer found:

> The WAC 663 is not supported with available evidence. No evidence the
> statement was intended to be a manipulative intimidating effort, or a factual
> statement of intent.

Dkt. 65 at 50–51. Plaintiff states that he felt the infraction was issued in retaliation for his

grievances of and challenges to Defendant's actions. Dkt. 153 at 2.

Defendant Watanabe asserts that she did not act out of retaliatory intent, but instead felt

at the time, and still believes, that Plaintiff made his litigation threat in an attempt to bully and to

intimidate her into not performing her job duties. Dkt. 149 at ¶ 4.

Defendants have also submitted a copy of the Resolution Program Manual, which sets

forth the rules and procedures governing the DOC grievance process. Dkt. 148-1. The Manual

states that informal resolution of a conflict is preferable to pursuing a formal resolution. Dkt.

148-1 at 6. A prisoner initiates informal resolution by talking to the persons involved, or by

submitting "kites," letters, or kiosk messages. *Id*. However, informal resolution is not required

prior to filing a formal grievance (known as a "Resolution Request."). *Id*.  A formal grievance is

initiated by filing a Resolution Request form. *Id*. at 19. The Manual provides that a Resolution

Request under the program may not be submitted using a prison's "kite" or kiosk system. Dkt.

148-1 at 21.

---

[6] This infraction indicates that Defendant Watanabe had previously filed another infraction notice against Plaintiff for abuse of the grievance program. Dkt. 65 at 48. The earlier infraction is not at issue in this case.

1    Prisoners are permitted to have only five active grievances at a time. *Id*. at 18.

2    Submission of more than the maximum number of Resolution Requests constitutes abuse of the

3    program; persistent abuse may result in an infraction. *Id*. at 19.

4        2.   Analysis

5            a.   *First Amendment Violation*

6    An allegation of retaliation for a prisoner's exercise of his First Amendment right to file

7    grievances or to pursue litigation against prison officials may support a claim under § 1983;

8    without this constitutional protection, inmates would be left without a viable mechanism to

9    remedy prison injustices. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005).

10   Plaintiff must prove five basic elements to prevail on such a claim of retaliation: (1) an

11   assertion that a state actor took some adverse action against an inmate (2) because of (3) that

12   prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of

13   his First Amendment rights, and (5) the action did not reasonably advance a legitimate

14   correctional goal." *Id.* at 567–568. The plaintiff must also show the protected conduct was the

15   substantial or motivating factor driving the prison official's conduct. *See Mt. Healthy City Sch.*

16   *Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 286–287 (1977); *Brodheim v. Cry,* 584 F.3d 1262,

17   1271 (9th Cir. 2009).

18   First, Plaintiff was charged with intimidation, a "serious infraction," for which Defendant

19   Watanabe suggested a sanction of 30 days' communication restriction. Dkt. 60. Defendant

20   argues there was no adverse action here because, ultimately, Plaintiff was found not guilty and

21   was not sanctioned. Dkt. 131 at 11. But it is not necessary that Plaintiff actually endure

22   punishment; instead, "the mere *threat* of harm can be an adverse action, regardless of whether it

23   is carried out because the threat itself can have a chilling effect." *Brodheim*, 584 F.3d at 1270.

24   Here, the infraction imposed the threat of a significant sanction upon Plaintiff, which could (and,

Plaintiff alleges, did) impose a chilling influence. Dkt. 153 at 2. *See Brown v. Crowley*, 312 F.3d 782, 789 (6th Cir. 2002) (Even where the infraction is ultimately found to be without merit, "a reasonable jury could conclude that being subjected to the risk of such severe sanctions for raising a legitimate complaint 'would deter a person of ordinary firmness from continuing to engage in that [protected] conduct.'").

Second, the parties disagree regarding the causation element. Defendant asserts that her intention was not to retaliate, but instead to sanction intimidating behavior. Dkt. 149 at ¶ 4. But it is also beyond dispute that the infraction is based upon Plaintiff's threat of litigation, which is quoted in the notice. Dkt. 146 at 60. Indeed, if the final sentence—"let Watanabe know, I will see her in Court"—were removed, it would be difficult to construe the remainder of Plaintiff's kiosk message as containing any intimidation or coercion. In short, the very activity that is protected—a litigation threat—is the foundation of the infraction. Although Defendant Watanabe argues she acted solely to enforce the rule imposing a five-grievance limit, viewing the evidence in the light most favorable to Plaintiff, there is at a minimum an issue of fact on the causation issue.

Third, The parties also disagree on the protected activity element. Defendant appears to argue that because the communication was contained in an informal kiosk message, rather than a formal grievance, it is not entitled to First Amendment protection. *See* Dkt. 147 at 8–10. However, Ninth Circuit law is now clear that the form of a complaint—whether it is a formal grievance, an informal kite or kiosk message, or an oral comment—"is of no constitutional significance"; all can qualify as protected activity. *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017). Moreover, it is not just grievance (or grievance-like) communications that enjoy constitutional protection, but also threats to initiate litigation. *Id*. at 1039 ("The dichotomy that

1  the district court drew between formal and informal grievances has no constitutional

2  underpinning; nor does the distinction between a threat to initiate litigation and the litigation.").[7]

3  Here, Plaintiff's activity implicates the "most fundamental of the constitutional protections that

4  prisoners retain"—namely, the right "to pursue civil rights litigation." *Id*. at 1039.

5        <u>Fourth</u>, as discussed above, the filing of a major infraction, with its potential for a

6  significant sanction, can have a chilling effect. At a minimum, there is a jury question whether

7  the potential for such a sanction would be "sufficient to 'chill or silence a person of ordinary

8  firmness from future First Amendment activities.'" *Brodheim*, 584 F.3d at 1271.

9        <u>Fifth</u>, the parties dispute whether the infraction reasonably advanced a legitimate

10  correctional goal. Defendant asserts she was protecting the integrity of the grievance program's

11  five-grievance limit. But viewing the evidence in the light most favorable to Plaintiff, a fact

12  dispute exists as to whether applying the intimidation rule to Plaintiff's protected conduct was

13  justified. *See, e.g., Hargis v. Foster*, 312 F.3d 404, 411 (9th Cir. 2002) ("[a] jury could

14  reasonably find that charging [plaintiff] with such a severe disciplinary infraction as coercion

15  was an 'exaggerated response' to conduct that posed, at most, a de minimis risk to security.").

16        The Court finds there are issues of fact preventing the entry of summary judgment on

17  Plaintiff's retaliation claims. The Court therefore considers whether Defendant is entitled to

18  qualified immunity.

---

[7] Defendants cite to a prior case from this District, *Holmes v. Miller-Stout*, No. 3:17-CV-05145-RJB, 2018 WL 828384 (W.D. Wash. Feb. 12, 2018). But *Holmes* is distinguishable. First, its qualified immunity analysis required the application of case law as of 2014, three years before *Entler* was decided. *Id*. at *3. But more fundamentally, *Holmes* involved a kiosk message that was neither "grievance-like" nor (as in this case) making a legally protected threat of litigation; instead, the message in *Holmes* made an unprotected threat of potential violence. *Id*. at *1.

1      b.      _Qualified Immunity_

2          Unless plaintiff makes a two-part showing, qualified immunity shields government

3   officials from liability for damages. The plaintiff must show: (a) the official(s) violated a federal

4   statutory or constitutional right; and (b) at the time of the alleged act or failure to act, there was

5   clearly established law that defined the contours of the federal right, such that every reasonable

6   official would understand that what they are doing is unlawful. _City of Escondido, Cal. v._

7   _Emmons_, 139 S. Ct. 500, 503 (2019).

8          The Court may analyze the two prongs of qualified immunity in either order. _Pearson v._

9   _Callahan_, 555 U.S. 223, 236 (2009). With respect to the second prong, "[t]hough the

10  constitutional right must be clearly established such that 'a reasonable official would understand

11  that what he is doing violates that right,'. . . '[t]here need not be a case dealing with these

12  particular facts to find [the officer's] conduct unreasonable.'" _Scott v. Cnty. of San Bernardino_,

13  903 F.3d 943, 951 (9th Cir. 2018) (_quoting Hope v. Pelzer_, 536 U.S. 730, 739 (2002); _Doe ex rel._

14  _Doe v. Hawaii Dep't of Educ._, 334 F.3d 906, 910 (9th Cir. 2003)).

15         As discussed above, the Court finds there are triable issues of fact as to whether

16  Defendant Watanabe violated a constitutional right. The qualified immunity inquiry therefore

17  focuses on the second prong. Here, Ninth Circuit case law at the time of Defendant's infraction

18  notice in March 2021 clearly established the right alleged by Plaintiff.

19         _Entler_ presents a scenario closely analogous to Plaintiff's case. First, both plaintiffs

20  expressed themselves in informal kiosk messages, but threatened to bring litigation to enforce

21  their rights. _Entler_, decided in 2017, as well as the earlier cases upon which it relies, makes clear

22  that Plaintiff's right to express his dissatisfaction did not "hinge on the label" applied to his

23  complaint. 872 F.3d at 1041 _(quoting Brodheim_, 584 F.3d at 1271). Importantly, _Entler_ also

24  makes clear that a threat to commence litigation enjoys just as much constitutional protection as

the actual pursuit of litigation. *Id*. at 1042 ("'[w]e see no legal distinction to be made between the filing of a charge which is clearly protected, and threatening to file a charge.'") (*quoting Gifford v. Atchison, Topeka and Santa Fe Ry. Co.*, 685 F.2d 1149, 1156 n.3 (9th Cir. 1982)).

Defendants argue *Entler* is inapposite because there, plaintiff was found guilty of the infractions and was punished. But Ninth Circuit law is clearly established that "the mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect." *Brodheim*, 584 F.3d at 1270.

The Court finds that Defendant is not entitled to qualified immunity, and therefore recommends that Defendants' motion for summary judgment be denied as to Plaintiff's Count 1 retaliation claim against Defendant Watanabe.

**B.      Grievance Processing (Counts 2 and 3)**

Plaintiff contends Defendant Watanabe violated his First Amendment rights when she failed to provide Plaintiff a copy of the written resolution of a misconduct complaint he had filed against a staff member. Dkt. 65 at 29–30; Dkt. 152 at 3. Plaintiff also asserts that Defendants Smith, Watanabe and Stemler violated his First Amendment rights by refusing to process his grievances regarding the conditions of his COVID-19 isolation. Dkt. 65 at 30. Defendants argue that, as a matter of law, Plaintiff's claims do not state a cognizable legal claim. Dkt. 131 at 12–13.

"It is well-established that, among the rights [prisoners] retain, prisoners have a First Amendment right to file grievances." *Brodheim*, 584 F.3d at 1269. Further, even during incarceration, prisoners retain their Fourteenth Amendment due process protections. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003). However, "[t]here is no legitimate claim of entitlement to a [prison] grievance procedure." *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.

1988). Inmates "lack a separate constitutional entitlement to a specific prison grievance procedure," and so a stand-alone claim based on a deprivation of the grievance procedure does not implicate Plaintiff's constitutional rights. *Ramirez*, 334 F.3d at 860 (citing *Mann*, 855 F.2d at 640).

Here, Plaintiff claims only that Defendants failed to follow grievance or other conflict resolution procedures. However, there is no evidence that Defendants blocked access to the grievance process or prevented Plaintiff's use of it. Though Plaintiff disagrees with Defendants' denial of his grievances, the record demonstrates he remained able to bring them. Because plaintiff has no standalone right to any particular grievance process, he has not stated a claim. Therefore, Claims 2 and 3 fail as a matter of law and the Court recommends that they be dismissed.

## C.    First Amendment Claim for Failure to Facilitate Consulate Call (Count 4)

Plaintiff alleges Defendants Warner, Kullojka and Stemler violated his First Amendment rights by failing to facilitate a telephone call with his Consulate. Dkt. 65 at 31.

Plaintiff filed multiple grievances and appeals seeking a secure telephone call with the consulate of the Democratic Republic of the Congo, of which he is a citizen. *See* Dkt. 146 at 34–45. In responding to Plaintiff's Level II appeal, Defendant Warner acknowledged that DOC policy provided for a secure telephone line for consulate calls and noted that MCC was working to establish such a line. Dkt. 146 at 42. The response noted the embassy was then closed due to COVID, but provided an address Plaintiff could use to communicate with his consulate in writing. *Id.*

Plaintiff asserts that his right to telephonic communication with his consulate arises from a treaty, a United Nations resolution, and DOC guidelines. *See* Dkt. 132-1 (Plaintiff's

Interrogatory Answer), identifying Sections 1(a) and 2 of the *Vienna Convention on Consular Relations*, U.S.T. 77 Dec. 24, 1969 ("Vienna Convention"), Rule 62 of United Nations General Assembly Resolution 70/175 ("Nelson Mandela Rules"), and DOC Policy 450.200 Directive I(E)(2).

In order to state a claim under § 1983, Plaintiff must allege the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt*, 451 U.S. at 535. None of the provisions cited by Plaintiff provides a private right of action enforceable through § 1983.

As a threshold matter, the Vienna Convention provision Plaintiff relies upon discusses only a right by the consular officers to "communicate" with their nationals;[8] it does not provide any specific right to communication by telephone. Here, Defendants provided an address at which Plaintiff could communicate in writing with his consulate. Dkt. 146 at 42. More fundamentally, however, the provision cannot support a § 1983 claim. In *Cornejo v. Cnty. of San Diego*, 504 F.3d 853, 863–64 (9th Cir. 2007), the Ninth Circuit evaluated whether this Vienna Convention provision could form the basis for a § 1983 action, and held that it did not: "Article 36 does not unambiguously confer a right in individual detainees to support a cause of action under § 1983." *Id*. at 863. Therefore, the court held, the plaintiff "cannot state a claim under § 1983." *Id*. at 864.[9]

---

[8] Section 1(a) provides:

> consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State.

Vienna Convention, Section 1(a).

[9] Plaintiff cites *United States v. Rangel–Gonzales*, 617 F.2d 529 (9th Cir. 1980), a criminal case addressing an immigration regulation, not the Vienna Convention itself. The Ninth Circuit subsequently distinguished *Rangel-Gonzales*, noting that stands only for a narrow proposition related to prosecutions for illegal reentry. *See United States v. Lombera–Camorlinga*, 206 F.3d 882, 887 (9th Cir. 2000).

The Nelson Mandela Rules have even less force as a source for a § 1983 claim. As the Ninth Circuit noted, the provision "is not a treaty, and it is not binding on the United States. Even if it were a self-executing treaty, the document does not purport to serve as a source of private rights." *Serra v. Lappin*, 600 F.3d 1191, 1197 (9th Cir. 2010). Accordingly, Plaintiff cannot state a claim under § 1983 based on an alleged violation of the Nelson Mandela Rules. *See Renfro v. W. Valley Det. Ctr. Classification Staff*, No. 521CV01414JGBJDE, 2022 WL 18228280, at *4 (C.D. Cal. June 3, 2022); *Wainwright v. Med. Dep't Cuyahoga Cnty. Corr. Ctr.*, No. 1:17-CV-1621, 2018 WL 2077507, at *3 n.41 (N.D. Ohio May 4, 2018) ("the Nelson Mandela rules . . . are not a source of justiciable rights" for purposes of a § 1983 claim).

Finally, DOC regulations do not create rights secured by the Constitution or laws of the United States and are also legally insufficient to support a § 1983 claim. State policies and regulations are "not designed to confer rights on inmates," but are instead "primarily designed to guide correctional officials in the administration of a prison." *Sandin v. Conner,* 515 U.S. 472, 481–82 (1995). Although "[p]rison regulations governing the conduct of correctional officers" are "relevant in determining whether an inmate's right was clearly established," they do not confer rights. *Furnace v. Sullivan,* 705 F.3d 1021, 1027 (9th Cir. 2013) (citations and internal quotation marks omitted); *see also Parra v. PacifiCare of Arizona, Inc.,* 715 F.3d 1146, 1154 (9th Cir. 2013) ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it *may not create a right* that Congress has not.") (emphasis added; citation and internal quotation marks omitted). Thus, Plaintiff has no separate constitutional claim for Defendants' alleged violation of DOC policies.

1    Plaintiff has not identified a legally cognizable federal right to telephonic communication

2    with his consulate, and cannot state a claim under § 1983. The Court therefore recommends that

3    Count 4 be dismissed.

4    **D.    Eighth Amendment Claims (Counts 5 and 6)**

5    Plaintiff alleges that Defendants violated his Eighth Amendment rights by imposing

6    "inhumane" COVID-19 isolation conditions, and by creating overcrowded conditions increasing

7    the risk of COVID-19 transmission during the pre-closure consolidation of WSR. Dkt. 65 at 31–

8    33. Defendants contend that Plaintiff has failed to adduce evidence establishing that each

9    Defendant knew of, and disregarded, a substantial risk of serious harm and, in any event,

10    Defendants responded reasonably to any such risk. Dkt. 131 at 16–21.

11    The Constitution does not mandate comfortable prisons, but neither does it permit

12    inhumane prisons. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Under the Eighth Amendment,

13    prison officials are required to provide prisoners with basic life necessities, such as food,

14    clothing, shelter, sanitation, medical care, and personal safety. *Id.*; *Toussaint v. McCarthy*, 801

15    F.2d 1080, 1107 (9th Cir. 1986). The circumstances, nature, and duration of a deprivation of

16    these necessities must be considered in determining whether a constitutional violation has

17    occurred. *Johnson v. Lewis,* 217 F.3d 726, 731 (9th Cir. 2000). Further, "[s]ome conditions of

18    confinement may establish an Eighth Amendment violation 'in combination' when each would

19    not do so alone, but only when they have a mutually enforcing effect that produces the

20    deprivation of a single, identifiable human need such as food, warmth, or exercise—for example,

21    a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501

22    U.S. 294, 304 (1991) (emphasis omitted).

23

24

1        Two requirements must be met to prevail on such an Eighth Amendment claim for

2   unconstitutional conditions of confinement. First, a Plaintiff must show that a Defendant's acts

3   or omissions deprived the inmate of "the minimal civilized measure of life's necessities." *Allen*

4   *v. Sakai,* 48 F.3d 1082, 1087 (9th Cir. 1994) (quoting *Farmer,* 511 U.S. at 834). For a claim (like

5   the one here) based on a failure to prevent harm, "the inmate must show that he is incarcerated

6   under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 832 (internal

7   citation and quotation marks omitted).

8        Second, Plaintiff must establish the Defendants acted with deliberate indifference to an

9   excessive risk to inmate health or safety. *Id*. "To violate the Cruel and Unusual Punishments

10  Clause, a prison official must have a sufficiently culpable state of mind." *Id*. at 834 (internal

11  quotations omitted). "In prison-conditions cases th[e] state of mind is one of 'deliberate

12  indifference' to inmate health or safety[.]" *Id*. (*citing Wilson*, 501 U.S. at 302–03 (1991)). A

13  prison official does not act with deliberate indifference "unless the official knows of and

14  disregards an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837. Thus, a prison

15  official must both be aware of facts from which the inference could be drawn that a substantial

16  risk of serious harm exists, and he must also draw the inference. *Id*. at 847. "In addition, prison

17  officials who actually knew of a substantial risk to inmate health or safety may be found free

18  from liability if they responded reasonably to the risk, even if the harm ultimately was not

19  averted." *Id*. at 844

20        1.    <u>Conditions of COVID-19 Isolation (Count 5)</u>

21        Plaintiff contends the conditions in the COVID-19 isolation unit where he was confined

22  for 21 days violated his Eighth Amendment rights. Plaintiff brings this claim against Defendants

23  Obenland, Warner and Kullojka.

24

REPORT AND RECOMMENDATION - 22

1          a.    *Facts*

2      Plaintiff received a positive test result for COVID-19 on January 2, 2021, and on that day

3  was transferred to COVID isolation. Dkt. 65 at 40. At MCC, symptomatic prisoners were

4  isolated in the IMU, while non-symptomatic prisoners who tested positive were housed in a

5  different facility in the gym. Dkt. 65 at 11. Plaintiff's isolation lasted for 21 days, after which he

6  was returned to his regular housing in WSR's C unit. Dkt. 65 at 13.

7      Plaintiff states he was housed in a dirty cell and although he requested cleaning supplies,

8  he did not receive them for "over four days." Dkt. 146 at 5. He did not receive a shower for four

9  days, and for the first five days of his isolation, was denied phone access. *Id*. Plaintiff also states

10  he received cold meals and was denied access to fresh air for the duration of his 21 days'

11  confinement in the isolation unit. Dkt. 65 at 11.

12      Plaintiff states that he attempted to file grievances regarding these conditions, but they

13  were rejected as not "grievable" by Defendants Smith and Stemler. Dkt. 65 at 35. Plaintiff

14  attached to his Amended Complaint the following grievances addressing the conditions of

15  Plaintiff's COVID isolation:

16      • Complaint form dated January 2, 2021 (no Log I.D.), requesting medical

17          evaluation; the response notes Plaintiff was seen at cellfront by a nurse (Dkt. 65 at

18          64);

19      • Log I.D. 21721551 dated January 5, 2020 (sic), addressing inability to contact

20          family; the response states conditions are required by COVID-19 protocols, but

21          "phones are being worked on" and will be scheduled soon (Dkt 65 at 66);

22      • Log I.D. 217222450 dated January (illegible), 2021, addressing limitation on

23          access to telephones and showers to only 3 time a week, when prisoners held in

24

REPORT AND RECOMMENDATION - 23

the gym quarantine facility received daily access; response notes DOC is
following COVID protocols and the matter is not grievable (Dkt. 65 at 66);

- Offender Complaint dated January 11, 2021 (no Log ID number), addressing lack
  of fresh air and requesting a daily shower (Dkt. 65 at 68);

- Log I.D. 21722430 dated January 27, 2021, post-isolation grievance of disparity
  of isolation conditions for symptomatic prisoners housed in IMU, compared to
  more favorable conditions in the quarantine facility in the gym; response notes the
  matter is not "grievable" (Dkt. 65 at 70);

- Log ID 21720926 dated February 24, 2021, grieving the rejection of Plaintiff's
  previous grievances of COVID-19 isolation conditions and requesting the
  grievances be sent to DOC headquarters (Dkt. 65 at 71); response states "not
  accepted-overlimit" (Dkt. 65 at 71).

In addition, Plaintiff has submitted grievances and appeals addressing his request for a call with
his embassy. *See* Dkt. 65 at 85; Dkt. 146 at 34–45.

> b. _Analysis_

Plaintiff has not established that the conditions of his COVID-19 isolation violated the
Eighth Amendment.

Plaintiff's evidence does not demonstrate serious harm or a deprivation of "the minimal
civilized measure of life's necessities" sufficient to meet the objective prong of the Eighth
Amendment test. *See Allen,* 48 F.3d at 1087. While lack of sanitation, denial of showers or lack
of access to outdoor exercise, when it is prolonged and severe, "unquestionably . . . can
constitute an infliction of pain within the meaning of the Eighth Amendment," a plaintiff must

demonstrate that those conditions were "more than temporary." *Anderson v. Cnty. of Kern,* 45 F.3d 1310, 1314 (9th Cir.) *opinion amended on denial of reh'g,* 75 F.3d 448 (9th Cir. 1995).

Here, the evidence shows the conditions Plaintiff identifies were only temporary. First, Plaintiff's confinement in the isolation unit was only 21 days. Moreover, Plaintiff's evidence demonstrates that he received showers every 3 days, was provided with cleaning supplies after four days, and was able to make telephone contact with his family every 3 days. Dkt. 146 at 5; Dkt. 65 at 66.

Particularly in light of the emergency posed by COVID-19, such limited restrictions do not rise to the level of a constitutional violation. *See Zuber v. Sorber,* No. 22-CV-3661, 2023 WL 3077807, at *5–7 (E.D. Pa. Apr. 21, 2023) (deprivation of soap, washcloth, cleaning supplies, showers and personal property (including hygiene products and a change of underwear) during Plaintiff's two-week COVID-19 isolation does not state a claim for violation of the Eighth Amendment). *See also McFarland v. Kullojka,* No. C18-457-JCC-JPD, 2019 WL 937237, at *5 (W.D. Wash. Jan. 30, 2019) (8-day deprivation of showers "w[as] not sufficiently serious to implicate Eighth Amendment concerns"), *report and recommendation adopted,* 2019 WL 934948 (W.D. Wash. Feb. 26, 2019); *Pamer v. Schwarzenegger,* No. CIV S-07-1902-MCE, 2010 WL 5418867, at *5 (E.D. Cal. Dec. 23, 2010) ("[A] one time denial of a shower for 15 days is insufficient [to violate the Eighth Amendment].") , *report and recommendation adopted,* 2011 WL 1221198 (E.D. Cal. Mar. 29, 2011).

Plaintiff has not established that his COVID-19 isolation subjected him to of "the minimal civilized measure of life's necessities." *Allen,* 48 F.3d at 1087. The Court therefore recommends that Count 5 of the Amended Complaint be dismissed with prejudice.

1    2.    WSR Consolidation (Count 6)

2    Plaintiff contends that the consolidation of the units within WSR violated his Eighth

3 Amendment rights by leading to overcrowding and inadequate protection against COVID-19.

4 Plaintiff brings this claim against Defendants Strange, Obenland, Jackson, and Warner. Dkt. 65

5 at 32–33.

6    a.    *Overcrowding*

7    The Court notes that Defendants have submitted evidence that the number of prisoners in

8 the A-B units was below their capacity and therefore not overcrowded. *See* Dkt. 20 at ¶¶ 9, 10.

9 However, even if they exceeded capacity, overcrowding, by itself, does not constitute a

10 constitutional violation. *See Doty v. Cnty. of Lassen*, 37 F.3d 540, 545 n.1 (9th Cir. 1994)

11 ("[O]vercrowding itself is not a violation of the Eighth Amendment . . . ."); *Hoptowit v. Ray*, 682

12 F.2d 1237, 1248–49 (9th Cir. 1982), *abrogated in part on other grounds by Sandin v. Conner*,

13 515 U.S. 472 (1995); *Rhodes v. Chapman*, 452 U.S. 337, 348–49 (1981) (same). Instead, the

14 overcrowding must be shown to have led to specific conditions violating the Eighth Amendment.

15 *See Balla v. Idaho State Bd. Of Corr.*, 869 F.2d 461, 471 (9th Cir. 1989) ("Technically, it may be

16 said that the prison is 50% 'overcrowded,' but this fact has no constitutional significance

17 standing alone . . . . Only when overcrowding is combined with other factors such as violence or

18 inadequate staffing does overcrowding rise to an eighth amendment violation."); *see also Akao v.*

19 *Shimoda*, 832 F.2d 119, 120 (9th Cir. 1987).

20    Plaintiff has not submitted evidence that the consolidation led to violence or inadequate

21 staffing. On the other hand, Defendants submitted evidence that there were no fights in A or B

22 unit after consolidation, that the noise level was maintained by unit staff, and there had been no

23 issues or concerns regarding the ventilation systems. Dkt. 20 at ¶¶ 11–15.

24

1    Plaintiff's primary complaint about double-celling is that it was difficult to use the toilet

2    in an uncomfortably small, shared space. Dkt. 65 at 94, 43. Plaintiff also submitted declarations

3    from other WSR prisoners asserting the same thing. *See* Dkt. 146 at 85, 87, 90, 94. This evidence

4    fails to establish a deprivation of the "minimal civilized measures of life's necessities" to such an

5    extent as to violate the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994);

6    *Norwood v. Hubbard*, No. 1:09-cv-00690-AWI-GSA, 2009 WL 2982653, at *1 (E.D. Cal. Sept.

7    11, 2009) ("[R]outine discomfort inherent in the prison setting does not rise to the level of a

8    constitutional violation.") (internal quotations and citations omitted).

9    Moreover, Defendants' evidence shows Plaintiff was double-celled at WSR only

10    temporarily. Plaintiff was moved from his previous housing into a double cell in "B" unit on

11    August 4, 2021; approximately three months later, on November 1, 2021, Plaintiff was

12    transferred from WSR to a different facility, and ultimately to SCCC, where he is expected to

13    remain. Dkt. 17 at 4; Dkt. 46 at ¶¶ 3, 5. Because the consolidation led only to short-term

14    discomfort or inconvenience, it does not support an Eighth Amendment claim. *See Anderson*, 45

15    F.3d at 1315 (no Eighth Amendment violation when plaintiff did not establish challenged

16    conditions were "more than temporary").

17    b.    *Management of COVID-19 Risk*

18    Plaintiff also alleges that ordering the consolidation during the COVID-19 pandemic

19    shows that Defendants were deliberately indifferent to the risk of COVID-19, and that

20    Defendants' COVID-19 response was inadequate. Dkt. 65 at 32–33. However, officials'

21    implementation of practices that could have resulted in overcrowding during the COVID-19

22    pandemic does not necessarily amount to an Eighth Amendment violation. *See Sanford v. Eaton*,

23    No. 1:20-CV-00792-BAM-PC, 2021 WL 3021447, at *7 (E.D. Cal. July 16, 2021), *report and*

24    *recommendation adopted in part, rejected in part*, 2022 WL 168530 (E.D. Cal. Jan. 19, 2022)

1    (holding that in order to state a cognizable Eighth Amendment claim, plaintiff must provide

2    more than generalized allegations that Defendants have not done enough regarding overcrowding

3    to control the spread of the virus.); *Vandagriff v. Hill*, No. 2:22-cv-0603-KJM-KJN, 2022 WL

4    1570942, at *3 (E.D. Cal. May 18, 2022) (same).

5        Here, Defendants have presented undisputed evidence that DOC took a comprehensive

6    and evolving approach to address the risks of COVID-19, establishing detailed protocols to

7    mitigate the transmission of the virus at its facilities. *See* Dkt. 21 at ¶¶ 4–7; Dkt. 21-1. The

8    protocols touch nearly every aspect of DOC's operations, consumed extensive staff work hours,

9    and required the expenditure of millions of dollars. Dkt. 21 at ¶ 4; Dkt. 21-1. Among the

10   safeguards contained in earlier versions of the protocol were masking requirements, screening of

11   transferees and incoming prisoners, quarantining exposed close contacts and cellmates, and

12   quarantining confirmed cases and symptomatic patients. *Id*. In addition, DOC's protocols

13   directly addressed measures to mitigate the transmission of the disease through transfers,

14   including screening and quarantine. Dkt. 21-1.

15       Moreover, as knowledge and available methods changed over time, the protocols have

16   adapted and evolved; as of July 13, 2021, DOC was on its 27th iteration of the protocol. Dkt. 21-

17   1. The protocol now also includes detailed provisions addressing such safeguards as testing,

18   vaccination and boosters, and the availability of effective antiviral and antiretroviral treatment

19   medications. *Id*.

20       Defendants' evidence shows they have reasonably  responded to the risk of COVID-19 at

21   DOC facilities. *See Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636–38 (9th Cir.

22   2021) (finding detainees failed to demonstrate ICE acted with deliberate indifference where ICE

23   complied with CDC interim guidance for its detention facilities, enacted system for reporting

24

1   suspected or confirmed COVID-19 cases on expedited timeframe, and enabled discretionary

2   release of at-risk detainees); *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 330 (3rd Cir.

3   2020) ("Nor does a failure to eliminate all [COVID-19] risk establish that the Government was

4   deliberately indifferent to [plaintiffs'] serious medical needs."); *see also Wilson v. Williams*, 961

5   F.3d 829, 841 (6th Cir. 2020) (finding prison officials took adequate actions to mitigate risk of

6   COVID-19 and that such actions demonstrated a lack of deliberate indifference); *Swain v.*

7   *Junior*, 961 F.3d 1276, 1287–1289 (11th Cir. 2020) (same).

8        Furthermore, Defendants do not need to show they eliminated *all* risk of contracting

9   COVID-19 to establish that they were not deliberately indifferent to its risks. That Plaintiff was

10  infected does not show that Defendants acted with deliberate indifference. *See Cole v. Sinclair*,

11  No. 3:21-cv-05089-RSM-BAT, 2021 WL 5889377, at *6 (W.D. Wash. November 8, 2021),

12  *report and recommendation adopted,* No. 3:21-cv-05089-RSM-BAT, 2021 WL 5882016 (W.D.

13  Wash. Dec. 13, 2021); *Johnson v. Kariko*, No. 3:20-cv-05514-BHS-JRC, 2022 WL 4073087, at

14  *1 (W.D. Wash. June 10, 2022), *report and recommendation adopted,* 2022 WL 4017671 (W.D.

15  Wash. Sept. 2, 2022); *Thibodeaux v. Haynes*, No. C21-5326-BHS-MLP, 2022 WL 1094793, at

16  *1 (W.D. Wash. Feb. 22, 2022), *report and recommendation adopted,* 2022 WL 1092674 (W.D.

17  Wash. Apr. 11, 2022).

18       Plaintiff has not come forward with evidence sufficient to counter the evidence supplied

19  by Defendants of their reasonable response to the dangers posed by the COVID-19 pandemic.

20  Therefore, the Court recommends that Count 6 of the Amended Complaint be dismissed.

21  **E.    Claims Against "Doe" Defendants**

22       Count 7 of the Amended Complaint alleges an unidentified "John Doe" Defendant made

23  racially derogatory remarks to Plaintiff. Dkt. 65 at 33. This claim is not brought against any of

24

the named Defendants. *Id*. The Amended Complaint also includes unidentified "Doe" Defendants among those named in Counts 5 and 6. *Id*. at 31–32. Plaintiff has not identified, nor sought service upon, any of the "Doe" Defendants.

Pursuant to Fed. R. Civ. P. 4(m), service of the summons and complaint must be made upon a defendant within 120 days after the filing of the complaint. Unless the Plaintiff can show good cause for his failure to serve, the Court shall dismiss the action without prejudice as to that Defendant or shall extend the time for service. Fed. R. Civ. P. 4(m). In cases involving a plaintiff proceeding *in forma pauperis*, "an incarcerated *pro se* plaintiff proceeding *in forma pauperis* is entitled to rely on the U.S. Marshal for service of the summons and complaint and . . . should not be penalized by having his action dismissed for failure to effect service where the U.S. Marshal or the court clerk has failed to perform his duties." *Walker v. Sumner*, 14 F.3d 1415, 1422 (9th Cir. 1994) (quoting *Puett v. Blanford*, 912 F.2d 270, 275 (9th Cir. 1990)), *abrogated on other grounds by Sandin*, 515 U.S. 472. "So long as the prisoner has furnished the information necessary to identify the defendant, the marshal's failure to effect service is "automatically good cause." *Walker*, 14 F.3d at 1422 (quoting *Sellers v. United States*, 902 F.2d 598, 603 (7th Cir. 1990)). However, where a *pro se* plaintiff fails to provide accurate and sufficient information to effect service of the summons and complaint, the Court's *sua sponte* dismissal of the unserved defendant is appropriate. *Walker*, 14 F.3d at 1421–22.

A court cannot exercise jurisdiction over a defendant without proper service of process. *See Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987); *Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th Cir.1988) ("A federal court does not have jurisdiction over a defendant unless the defendant has been served properly under Fed. R. Civ. P. 4").

1    The Court previously notified Plaintiff that his Amended Complaint did not allege viable

2  claims against the three "Doe" Defendants—including the sole Defendant against whom Count 7

3  is brought—because the Court cannot direct service on a Defendant who has not been identified

4  with sufficient specificity to effect service. Dkt. 64 at 3–4. Although Plaintiff has had ample

5  opportunity to conduct discovery to identify and properly to name the Doe Defendants, he has

6  not done so. Because more than 90 days have passed since Plaintiff filed his Amended

7  Complaint and he has not provided sufficient information for service of these Defendants, the

8  Court recommends that the claims against the three "Doe" Defendants, including Count 7 in its

9  entirety, be dismissed without prejudice for lack of personal jurisdiction. *See* Fed. R. Civ. P.

10  4(m).

11  **F.    State Law Claims**

12    Plaintiff also contends Defendants' actions have violated his rights under the Washington

13  State Constitution. Dkt. 65 at 29, 30, 31,32.[10]

14    Washington does not have a civil rights act akin to 42 U.S.C. § 1983 and alleged

15  violations of the State constitution are not independently actionable torts. *Reid v. Pierce County*,

16  136 Wn.2d 195, 213 (1998); *Spurell v. Black*, 40 Wn.App. 854, 861 (1985) (Washington due

17  process clause does not constitute an independent cause of action; state may invalidate actions

18  which do not conform with due process but may not award reparations); *Sys. Amusement v. State*,

19  7 Wn.App. 516 (1972).

20    Washington courts have consistently rejected invitations to establish a cause of action for

21  damages based upon constitutional violations without "the aid of augmentative legislation."

22

23  ---

[10] Plaintiff also alleges state statutory claims under Count 7. As discussed above, the Court recommends dismissal of
Count 7 without prejudice for the separate reason that Plaintiff has failed to identify a Defendant who can be served;
24  accordingly, the Court does not reach the issue of whether there is a viable state statutory claim.

1    *Blinka v. Washington State Bar Ass'n*, 109 Wn.App. 575, 591 (2001) *citing Sys. Amusement,*

2    *Inc.*, 7 Wn.App. at 517); *see also Spurrell*, 40 Wn.App. at 861; *Reid*, 136 Wn.2d at 213. Plaintiff

3    has not shown any "augmentive legislation" allows him to bring suit under the Washington State

4    Constitution here. Thus, Plaintiff has not raised a viable claim under the Washington State

5    Constitution and the Court recommends that Plaintiff's Washington State Constitution claims be

6    dismissed.

### IV.   CONCLUSION

8        The Court recommends that Defendants' motion for summary judgment (Dkt. 131) be

9    **GRANTED in part and DENIED in part**. The Court recommends that Defendants' motion be

10   **DENIED** as to Plaintiff's retaliation claim against Defendant Watanabe in Count 1, and that the

11   motion be **GRANTED** as to Plaintiff's claims in Counts 2 through 6 against the named

12   Defendants and that those claims be **DISMISSED with prejudice**. The Court further

13   recommends that Plaintiff's claims against "Doe" Defendants, including Count 7, be

14   **DISMISSED without prejudice**.

15       Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

16   fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

17   6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

18   review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

19   objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

20   *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

21   //

22   //

23   //

24

imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on September 29, 2023, as noted in the caption.

Dated this 14th day of September, 2023.

Grady J. Leupold
United States Magistrate Judge

REPORT AND RECOMMENDATION - 33